******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MELVIN JONES *v.* STATE OF CONNECTICUT,
STATE'S ATTORNEY'S OFFICE
(AC 37043)

DiPentima, C. J., and Lavine and Sheldon, Js.

*Argued February 8—officially released May 17, 2016*

(Appeal from Superior Court, judicial district of
Tolland, Sferrazza, J.)

*Allison M. Near*, with whom were *Richard A. Reeve*

and, on the brief, *Michael O. Sheehan*, for the appellant (petitioner).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey Miranda*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. The petitioner, Melvin Jones, appeals from the judgment of the trial court denying his petition for a new trial on charges of capital felony in violation of General Statutes (Rev. to 1989) § 53a-54b (3)[1] and carrying a pistol without a permit in violation of General Statutes (Rev. to 1989) § 29-35,[2] of which he was found guilty by a jury in connection with the shooting death of the victim, Wayne Curtis, as he sat in his vehicle on Howard Avenue in New Haven on October 17, 1990. A jury in the New Haven Superior Court found the petitioner guilty on those charges at his retrial following our Supreme Court's reversal of his initial conviction in 1993. We subsequently affirmed the petitioner's conviction at the retrial in 1996.

In support of its claims against the petitioner at his retrial, the state presented testimony from several eyewitnesses who placed the petitioner, or a man looking like him, at or near the scene of the shooting at or about the time the victim was shot and killed. Some of the eyewitnesses claimed that they saw the petitioner arguing and/or fighting with the victim as the victim sat inside his parked vehicle just before he was shot. All of the eyewitnesses testified that when they saw the petitioner or the man looking like him on that occasion, he was wearing a camouflage jacket.

One eyewitness in particular, a drug addict and police informant named Frankie Harris, not only identified the petitioner as the man in the camouflage jacket she saw running away from the scene of the shooting just after she heard the sound of gunshots, but also testified that as the man fled, she saw him take off the camouflage jacket and throw it into a nearby dumpster. Harris further testified that after the man left the area, she retrieved the jacket from the dumpster and turned it over to the police, through whom it was introduced in evidence at trial. Although the jacket was connected to the victim by the unexplained presence, in one of its pockets, of a repair bill for work done on the victim's vehicle more than two years before the shooting, the state presented no forensic evidence to link the petitioner to the jacket, the victim, or the victim's vehicle.

In his new trial petition, the petitioner claimed that he was entitled to a new trial on the basis of newly discovered DNA evidence that allegedly established the reasonable probability that he would be acquitted of all charges in connection with the victim's death if he were granted a new trial. The new evidence he relied on in support of his petition was of two types. First, in 2010 and 2012, nuclear DNA testing using the STR (Short Tandem Repeat) method was performed on two samples of biological material collected from inside the collar and the sleeves of the camouflage jacket, which the petitioner allegedly threw into the dumpster as he

fled from the scene of the shooting. Such testing, he claimed, revealed the presence of nuclear DNA from at least two different individuals, neither of whom was the petitioner. Also in 2012, mitochondrial DNA (mtDNA) testing was performed on several hairs that police investigators had found inside the victim's vehicle during their initial investigation following the shooting. Only three of those hairs were found to be suitable for comparison. One such hair was a Caucasian type hair that was found to contain mtDNA consistent with that of the victim, a white male. The other two hairs that were suitable for comparison were Negroid type hairs that were found to contain mtDNA inconsistent with that of the petitioner, a black male. The latter results, claimed the petitioner, conclusively established that he was not the source of any testable Negroid type hairs found inside the victim's vehicle.

At a court trial on the petition, the respondent, the State of Connecticut, State's Attorney's Office, conceded that both types of DNA evidence proffered by the petitioner were newly discovered, but disagreed that the introduction of such evidence at a new trial would likely lead to the petitioner's acquittal. The trial court, after hearing testimony from several witnesses and considering extensive briefs and oral argument, agreed with the respondent and denied the petition. This appeal followed. For the following reasons, we agree with the trial court, and thus affirm its judgment denying the petition.

To put the petitioner's claim in his new trial petition in its proper context, we must begin by setting forth the factual and procedural history of the prosecution that led to the petitioner's challenged conviction. We described that history as follows in our decision affirming that conviction on direct appeal. "The [petitioner] appealed to this court from a judgment of conviction from his second trial. In the first proceeding, the case was tried to the jury before *Hadden, J.*, and the [petitioner] was convicted of capital felony in violation of § 53a-54b (3) and carrying a pistol without a permit in violation of § 29-35. The [petitioner] appealed to our Supreme Court. While that appeal was pending, the [petitioner] filed a petition for a new trial, which the trial court, *Booth, J.*, granted.[3] The Supreme Court then considered the [petitioner's] appeal, and reversed the judgment of conviction and remanded the case for a new trial.[4] See *State* v. *Jones*, 234 Conn. 324, 662 A.2d 1199 (1995). The [petitioner] was tried to a jury for a second time before *Fracasse, J.*, and convicted of capital felony and carrying a pistol without a permit. He was sentenced to life imprisonment without the possibility of parole. . . .

"The jury [at the second trial] reasonably could have found the following facts. On the morning of October 17, 1990, Bonaventure Console, who resided at 365 Howard

Avenue, New Haven, saw the [petitioner] walking toward an automobile parked across the street from his home. A white male, later identified as the victim, Wayne Curtis, was seated in the front of the vehicle. Console had frequently seen the [petitioner] in that neighborhood and later that same day . . . described him to the police as a black male with braided hair who always wore camouflage clothing.

"Shortly thereafter, Nilda Mercado, an eleven year old girl, passed the victim's vehicle on her way to school. Mercado witnessed a black male banging the head[5] of a white male, who was seated in the vehicle, against the car door. As she walked past the car, Mercado heard two gunshots fired. Immediately after the incident, Mercado informed her aunt that the black man had four[6] braids in his hair and wore camouflage clothing. Although Mercado could not make a positive in-court identification, she testified that the [petitioner] had similar braids and the same features as the perpetrator.

"Angel Delgado, a seventeen year old boy who lived on Howard Avenue, was looking out a second story window of his home at approximately 7:15 a.m. on October 17, 1990, when he witnessed the [petitioner] and the victim across the street. The victim was seated in a vehicle and the two men were arguing. Although Delgado saw only the side of the [petitioner's] face, and his view may have been somewhat obscured by a tree, he recognized the [petitioner] as someone he frequently had seen around that neighborhood during the weeks preceding the homicide. Delgado looked away for a moment and then heard gunshots. When he looked back, the [petitioner] was gone and the victim was lying in the driver's seat. Delgado saw a young girl, later identified as Mercado, running down Howard Avenue. He also described the [petitioner] as having four[7] braids and wearing camouflage clothing.

"Harris, who also knew the [petitioner] from that neighborhood, heard the shots and moments later saw the [petitioner] run toward her, remove a camouflage jacket and throw it in a nearby dumpster. She retrieved the jacket, which contained a work order from a service station for a wheel alignment performed on the victim's car. Harris admitted that she was a drug addict and a police informant. Harris testified, however, that at the time of the murder, she had not ingested any drugs and, at the time she spoke to the police, she was informed that she would not be paid for her information in connection with this case.

"Larry Hodge, also a narcotics user and police informant, first met the victim at a gas station on Route 80 in New Haven at 3 a.m. on October 17, 1990. Hodge paid the victim for a ride to Anastasio's truck stop in New Haven. After Hodge exited the vehicle and began to walk away, he saw a black male with braided hair approach the victim and get into the vehicle. After learn-

ing of the victim's death, Hodge, out of concern that his fingerprints in the automobile would be identified in the homicide investigation, contacted the police. In his interview with the police, Hodge gave a sworn statement identifying the [petitioner] from a photographic array as the man he had seen get into the victim's car. Hodge later retracted that identification before the jury. There was evidence that Hodge retracted the identification because he feared retaliation by people who had pressured him not to testify in the trial.

"Officer Brendan Cannon of the New Haven police department arrested the [petitioner] on October 19, 1990. At the time of his arrest, the [petitioner] had four braids and was wearing a size extra small camouflage jacket. . . . The camouflage jacket Harris retrieved from the dumpster was size large.

"Arkady Katznelson, an assistant state medical examiner, testified that the victim had died from loss of blood as a result of being shot in the abdomen at close range and that he had suffered facial bruises consistent with having had his head slammed against the . . . car door. A second bullet was recovered from the driver's side door." (Footnotes altered.) *State* v. *Jones*, 50 Conn. App. 338, 340–43, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).

The petitioner's defense at his second trial included testimony from a new eyewitness, Pasquale DeMaio. "On direct examination, DeMaio testified that on the morning of October 17, 1990, he was painting a house located at 358–60 Howard Avenue. When he was interviewed by the police later that day, and on another occasion shortly thereafter, he informed the police that he did not witness the homicide. DeMaio testified that he feared getting involved and, therefore, he did not disclose any information to the police on these two occasions. In 1993, DeMaio contacted the authorities and informed them that he had witnessed the homicide and that the [petitioner] was not the perpetrator. DeMaio testified that he contacted the police because he was no longer fearful of testifying. He also admitted that he came forward after the [petitioner's] friends, Frank LoSacco and Emma Jones, had contacted him. On cross-examination, the state asked DeMaio why LoSacco had contacted him and whether LoSacco had mentioned anything that may have encouraged DeMaio to contact the police. . . .

"On cross-examination, DeMaio admitted that both LoSacco and Emma Jones had informed him that the [petitioner] was wrongly convicted, and that the state's witnesses were drug addicts and paid informants. The state inquired whether those statements from Emma Jones and LoSacco, or other factors, motivated DeMaio to contact the authorities." Id., 347–48.

All of the state's eyewitnesses testified that the man

they saw at or near the time and place of the shooting was wearing a camouflage jacket. Console and Mercado both described him as wearing "an army jacket and jeans." Delgado identified him as wearing a camouflage coat; Hodge said that he was wearing "a flannel jacket or an army jacket . . . ." Like the other eyewitnesses, DeMaio stated that the man he saw was wearing a camouflage army jacket. Unlike the other witnesses, however, he described that jacket as having a patch on the back in the shape of the African continent.

The lack of forensic evidence in the case, either found by forensic examiners on the jacket Harris retrieved from the dumpster or recovered by the police from inside the victim's vehicle, was highlighted at trial. Testing of various stains found on the jacket produced negative results for the presence of blood.[8] Testing for the presence of nitrates, nitrites or lead on the cuffs of the jacket's sleeves also produced negative results, indicating that no gunshot residue was present on the areas tested. Comparisons of the petitioner's hair to hairs recovered from inside the victim's vehicle did not produce a match, due to what the state's expert witness described as the poor quality of the samples seized from the petitioner for comparison purposes. Furthermore, although the police found nine identifiable fingerprints and three identifiable palm prints in or on the victim's vehicle, the state's fingerprint examiners testified that no such prints had been left by the petitioner. Moreover, the police officer who processed the victim's vehicle testified that it "[was not] . . . a well kept interior, there was a lot of debris," and that it did not look like it had been taken to a car wash and vacuumed recently.

The state did present evidence that a Grippo's Service receipt was found in the jacket pocket. Peter Grippo, the owner of Grippo's Service, testified that the receipt was for a wheel alignment he had performed on the victim's vehicle in July, 1988, more than two years before the shooting.

The lack of forensic evidence on the jacket figured prominently in the parties' closing arguments. Attempting to minimize its significance, the state argued, "[C]ould blood have gotten on to the killer's jacket in this case? Sure, but did it? Nothing in the evidence says it did, and the evidence, the coat itself, it's sitting over there, that was thrown in the dumpster tells you to the contrary. The fact . . . that he didn't have any blood on his coat and he didn't have any gunshot residue on his coat and to claim that he did is simply speculating from evidence that doesn't exist. . . . You also have Frankie Harris, who is both an eyewitness and a circumstantial evidence witness. And what do I mean by that? Who sees this man who she's seen around a whole bunch of other times running from the crime scene after hearing gunshots, she sees him throw the jacket that I didn't pull out, but that's over

there, not some jacket with an imaginary African design on it, that jacket, into a dumpster. And in the pocket of that jacket is a receipt from work done on the victim's car . . . ." Although the petitioner's defense was that the state's eyewitnesses had misidentified him, his counsel argued that the lack of forensic evidence on the jacket meant that it, and thus by implication the petitioner, "ha[d] nothing to do with the homicide." As for the repair bill from Grippo's Service, counsel suggested that the police might have planted it in the jacket pocket.

On March 25, 1996, despite the exculpatory eyewitness testimony from DeMaio and the lack of forensic evidence linking the petitioner to the victim or the crime scene, the jury found the petitioner guilty on both charges. Thereafter, the court sentenced the petitioner to a total effective sentence of life imprisonment without the possibility of parole.

On July 3, 2013, fifteen years after this court affirmed his conviction on direct appeal, the petitioner filed the instant petition for a new trial. In that petition, as previously noted, he alleged that two pieces of newly discovered evidence provided reasonable cause for granting him a new trial. First, he relied on the results of DNA testing performed in 2010 and in 2012[9] on two samples of biological material recovered from the camouflage jacket that Harris had retrieved from the dumpster. Such testing was claimed to reveal the presence of nuclear DNA from at least two different individuals, neither of whom was the petitioner or the victim. Second, he relied upon the results of mtDNA testing in 2012 of certain Negroid type hairs found inside the victim's vehicle from which the petitioner was definitively excluded as the source.

The trial court, *Sferrazza, J.*, held an evidentiary hearing on the petition. During the hearing, the petitioner presented evidence that mtDNA testing was conducted on three of the hairs, two of which were Negroid type hairs that could have come from the same source. See generally *State* v. *Pappas*, 256 Conn. 854, 867–75, 776 A.2d 1091 (2001) (describing mtDNA and process of analyzing it). One such Negroid type hair was taken from the right front floor area of the victim's vehicle, below the seat where DeMaio testified that he saw the black man in the camouflage jacket sitting when he fought and/or argued with, then shot and killed, the victim. The other was taken from the left rear seat and floor area of the vehicle. The petitioner was excluded by mtDNA analysis as the source of those two hairs.[10]

In addition, the petitioner presented testimony from two state forensic science examiners who had collected and performed DNA testing by the STR method on biological material found inside the camouflage jacket. First, Lucinda Lopes-Phelan testified that nuclear DNA within skin cells can sometimes be found on clothing

in locations that have come into contact with the skin of persons wearing the clothing. Skin cells left in those locations by wearers of the clothing can sometimes be collected at a later time by swabbing such locations, which Lopes-Phelan did in this case on the interior collar of the jacket and the inner surfaces of the jacket's sleeves, about two to three inches in from the edges of the cuffs. Lopes-Phelan testified that the absence of a person's DNA from a sample of biological material collected from a garment he is claimed to have worn does not necessarily establish that he never wore the garment. Some people, she noted, are simply not good skin shedders; hence, samples collected from clothing they have worn are not likely to contain their skin cells, or thus their DNA. Even, moreover, when a person does leave skin cells in a swabbed location on a garment, such skin cells may be lost or contaminated before collection is attempted if, for example, the garment is initially subjected to other forensic testing. Biological material collected from worn garments also may become degraded, making it untestable, if it is stored in an improper manner or at an improper temperature. Here, for example, the witness noted, the cuffs of the jacket she ultimately swabbed for DNA had been swabbed earlier by police for the presence of nitrates, nitrites and lead, which possibly caused the loss or contamination of all or some of the DNA that may once have been present in that location. Lopes-Phelan also testified that before she collected the biological material from the jacket, the jacket had been stored inside a plastic bag, which may have promoted the growth of mold and bacteria, and thus degraded all or some of the DNA within it. Lopes-Phelan described the process of DNA degradation as follows: "It's just that DNA can be less detectible over time because bacteria could eat away at it, and over time, it will just degrade and will be broken down; that those markers that the DNA kits are looking for are not there any longer." One possible result of degradation of a collected sample is thus the loss of testable DNA from one or more prior wearers of clothing who contributed to that sample.

Finally, Lopes-Phelan advanced several reasons why the presence of other persons' DNA in swabbed locations that a suspect is believed to have touched does not necessarily exonerate the suspect. First, she noted, the garment in question may have been handled by other persons during the course of the pretrial investigation or at trial, possibly leading to the loss or contamination of the biological material deposited on it. Here, she noted, one such person was the forensic examiner who swabbed the interior cuffs of the jacket while testing it for gunshot residue in 1990. Second, she noted that skin cells could have been transferred to the jacket after it was handed over to the police by persons handling the jacket or talking over it and spraying it with saliva containing their own skin cells and nuclear DNA.

Next, Heather Degnan testified that she used the STR method to perform DNA testing on the samples that Lopes-Phelan had collected from the jacket. Degnan first described the methodology for STR testing in her testimony with the aid of a detailed powerpoint presentation. Then she confirmed Lopes-Phelan's testimony that DNA can degrade over time, and that improper packaging or storage at an improper temperature can accelerate such degradation. Degnan explained that the results of DNA testing of a degraded sample will appear as "ski slope[s], where you see higher levels of detection at the smaller regions that we are testing." The results of DNA testing of the biological samples collected from the jacket contained the "ski slope" pattern that gives evidence of DNA degradation. Degnan noted, however, that a degraded sample will not typically produce a false positive DNA profile. She then testified that the two samples collected from the jacket were both mixtures containing nuclear DNA from at least two individuals, neither of whom was the petitioner. Degnan testified that it was possible that the petitioner had worn the jacket, yet still not have contributed to either sample. In particular, she noted that it was possible for an article of clothing worn under a jacket to prevent skin cells from the wearer to be transferred to the jacket.

After the hearing, the trial court issued a written decision denying the petition for a new trial, in which it explained its ruling as follows: "The parties concur that the appropriate criteria governing determination of a petition for a new trial was set forth in *Asherman* v. *State*, 202 Conn. 429, [521 A.2d 578] (1987), and its progeny: (1) The proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial. Id., 434.

"The parties also agree that the DNA testing in 2010 and 2012 was newly discovered, material at a new trial, and not cumulative of evidence produced at the criminal trial.[11] Thus, the remaining question is whether the petitioner has proved, by a preponderance of the evidence, that the combination of the evidence admitted at the criminal trial with the DNA test results would likely produce an acquittal at a third criminal trial.

"Posttrial DNA testing of evidence [that] fails to match the DNA profile of the convicted person often justifies the collateral relief of a new criminal trial, but not always. The presence or absence of certain circumstances may tip the scales for or against affording a new trial, and the court decisions in this area are quite fact-bound. In *State* v. *Hammond*, 221 Conn. 264 [280, 604 A.2d 793 (1992), abrogated in part on other grounds by *State* v. *Ortiz*, 280 Conn. 686, 719–20 n.19 and 722 n.22, 911 A.2d 1055 (2006)], our

Supreme Court, on direct appeal, overturned a guilty verdict for kidnapping and sexual assault based on blood typing and the DNA analysis of semen stains on the victim's undergarments and jeans. These test results excluded the [defendant] as the contributor. The high court reversed the trial court's denial of the [defendant's] motion for a new trial. The court held that the scientific analysis excluding the [defendant] as the source of the stain was dispositive because of the undisputed timing of when the garments had last been laundered and when the victim last had intercourse before the rape. Id., 279–86. The Supreme Court also placed significance on the improbability of contamination. Id. . . .

"Other appellate decisions have upheld the trial court's denial of a new trial where DNA results failed to match the profile of the convictee. In *State* v. *Whipper*, 258 Conn. 229 [780 A.2d 53 (2001), overruled in part on other grounds by *State* v. *Cruz*, 269 Conn. 97, 106, 848 A.2d 445 (2004), and *State* v. *Grant*, 286 Conn. 499, 535, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008)], our Supreme Court affirmed the trial court's refusal to grant a motion for a new trial based on DNA evidence favorable to the defendant because the trial court 'was not confronted with uncontroverted evidence that precluded the jury from convicting the defendant . . . .' Id., 248. Because the evidence in that case was not such that rendered a guilty verdict scientifically . . . impossible, the denial of the motion for a new trial was not an abuse of discretion. Id., 249. In *Whipper*, supra, the opportunity for contamination and/or degradation supported the trial court's assessment that the DNA results were 'unpredictable and difficult to explain.' Id., 254. . . .

"The court finds that the methods used to perform the DNA analyses were scientifically appropriate, that the methods were expertly executed, and that the outcomes obtained were accurate. By accurate, the court means that the test results correctly reflected the DNA profiles [that] could be successfully produced from the materials tested. The absence of a DNA profile match with the victim or petitioner does not, of course, necessarily imply that neither had contact with the jacket or that the petitioner was never in the victim's car. The results simply demonstrate their DNA was not detected on or in the items tested.

"Thus, this case differs from one where the DNA test results refute earlier, and more primitive, forensic opinions. Nor is this case one where the DNA profiles discovered conclusively determine who perpetrated the crime, such as might arise when DNA in the semen of the rapist excluded or identified an individual as the source of the DNA.

"At the petitioner's retrial in 1996, Assistant State's Attorney James Clark conceded that no forensic evi-

dence implicated the petitioner as the murderer. Attorney Clark candidly acknowledged to the jury that the state's case at that retrial hinged on the eyewitness identifications of the petitioner, or someone strongly resembling him, as being near or in the victim's car around the time of the killing, as arguing with the victim, and as beating the victim in his car. He [also was] identified by Frankie Harris as the person who, shortly after the shooting, threw a camouflage jacket into a dumpster, which she later retrieved and subsequently turned over to the police. That jacket contained a document [that] was connected to the victim and his vehicle.

"The forensic examinations [that] were able to be conducted at the time the police originally investigated this murder failed to produce results [that] incriminated the petitioner. No [gunshot residue] was detected on the jacket sleeves nor was blood spatter observed. These negative results were obtained despite the circumstances that blood was diffusely spattered within the vehicle and [gunshot residue] from two gunshots was conspicuously observed on the victim's clothing. The assailant had bashed the victim's head against the driver's side door and/or door frame repeatedly. Yet, no blood or [gunshot residue] was found on the jacket. The hairs garnered from the victim's car were compared to the petitioner's hair, and no link was shown. Also, none of the fingerprints or palm prints obtained from an inspection of the vehicle matched those of the petitioner.

"The crucial question, then, is whether the petitioner has proven, by a preponderance of the evidence, that the additional negative forensic evidence with respect to the jacket and hairs, obtained around twenty years after the original, negative forensic results were known, is reasonably likely to produce a different outcome when combined with the rest of the evidence in this case. The court concludes that the petitioner has failed to meet this burden.

"Two juries[12] determined that the petitioner murdered the victim, beyond a reasonable doubt, despite the lack of forensic evidence connecting the petitioner to the victim, his vehicle, or his death. The jury at the 1996 trial found the petitioner culpable even though a new witness, Pasquale DeMaio, expressly testified that he witnessed the murder and that the petitioner was not the murderer.

"Clearly, the testimony of the other eyewitnesses who recognized the petitioner as having entered the victim's car a few hours before the shooting, as standing near or being in the victim's car near the time of the shooting, and as having discarded a coat with paperwork belonging to the victim in a dumpster shortly after the gunshots were heard was so convincing that that testimony eliminated any reasonable doubt as to the petitioner's guilt, despite the absence of confirmatory forensic evidence

on the jacket. . . .

"Defense counsel at the retrial hammered away at the lack of blood spatter and soot on the jacket, and the failure to discover the [petitioner's] fingerprints or palm prints despite a thorough examination of the victim's car. The petitioner's trial counsel repeatedly stressed that the lack of forensic evidence connecting the petitioner with the crime scene indicated that the eyewitnesses misidentified the petitioner as the killer.

"This court considers the importance of Frankie Harris' identification of the petitioner as the person who discarded the jacket in a different light than that cast by Attorney Clark in his summation. The significance of the nexus of the jacket with the petitioner was not so much that the petitioner wore the jacket when he murdered the victim but that the petitioner possessed and threw away a jacket [that] contained a mechanic's estimate given the victim to repair the victim's car. The wearer of the jacket was of lesser relevance. . . .

"The facts that the petitioner was wearing a different camouflage jacket two days after the murder, that the jacket thrown into the dumpster was of a larger size than the jacket the petitioner was wearing, that the jacket from the dumpster was devoid of any blood spots or gunshot residue, and that the victim's rather pedestrian paperwork was in the discarded jacket strongly suggests that neither the victim nor the killer was wearing the jacket at the time of the shooting and also that the jacket had been in the victim's car.

"The pertinent nexus between the jacket thrown in the dumpster and the perpetrator was not one of the garment and wearer but rather of possessor and occupancy of the victim's vehicle. Frankie Harris recognized the petitioner, as a person with whom she was familiar, as that possessor, known to her as YoBoy.

"The DNA test results performed with respect to the jacket and the hairs collected were not cumulative of the criminal trial evidence in the sense that these forensic examinations were not merely more sophisticated repetitions of earlier tests for blood spatter and gunshot residue. However, in the final analysis, the DNA results were consistent with what the previous two juries and trial attorneys already knew, viz. that no forensic evidence tied the petitioner to the jacket, the crime scene, or the victim.

"The DNA result that some unknown person's DNA profile was extracted from the jacket adds little to the petitioner's case. The petitioner's present counsel recognizes that the prosecution would be allowed, at a new trial, to probe the nonsterile manner in which the jacket was treated by Harris, the earlier forensic examiner looking for gunshot residue, the plastic bag issue regarding DNA degradation, and the many opportunities for several persons to touch the jacket or deposit

tiny droplets of saliva upon it over the twenty year period [that] elapsed between the incident and the 2010 DNA testing.

"Because the eyewitness identification of the petitioner was so compelling, despite the previous negative test results and despite the recantation of Hodge and new testimony of DeMaio, the DNA test results fail to persuade this court, by a preponderance of the evidence, that the combination of that new forensic evidence with all the other evidence in this case would likely produce an acquittal." (Citations omitted; emphasis omitted; footnotes added.)

On appeal, the petitioner claims that the trial court erred in concluding that the new DNA evidence would not likely have produced an acquittal if he were granted a new trial. He argues, more particularly, that the trial court erroneously concluded that (1) "neither the victim nor the perpetrator was wearing the jacket"; (2) "the new DNA evidence was consistent with the fact that there was no forensic evidence linking [the petitioner] to the crime"; and (3) "the eyewitness testimony was . . . so compelling as to counteract the import of the newly discovered DNA evidence."

"Pursuant to [General Statutes] § 52-270, a convicted criminal defendant may petition the Superior Court for a new trial on the basis of newly discovered evidence. See Practice Book § 42-55. A trial court's decision on that ground is governed by the standard set forth in *Asherman* v. *State*, [supra, 202 Conn. 434] . . . and further refined in *Shabazz* v. *State*, 259 Conn. 811, 827–28, 792 A.2d 797 (2002). Under the *Asherman* standard, a court is justified in granting a petition for a new trial when the petitioner demonstrates that the evidence offered in support thereof: (1) is newly discovered such that it could not have been discovered previously despite the exercise of due diligence; (2) would be material to the issues on a new trial; (3) is not cumulative; and (4) is likely to produce a different result in the event of a new trial. *Asherman* v. *State*, supra, 434. . . .

"[Our Supreme Court] further explained in *Shabazz* that, in determining whether a different result would be produced in a new trial, a trial court necessarily must engage in some form of credibility analysis. . . . The trial court must always consider the newly discovered evidence in the context of the evidence presented in the original trial. . . . [Thus, if] the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice, the fourth element of the *Asherman* test would be satisfied. [*Shabazz* v. *State*, supra, 259 Conn.] 827–28. By a different result, we mean that the new evidence would be likely to result in acquittal of the petitioner, not merely that it might cause one or more jurors to have a reason-

able doubt about the petitioner's guilt. Id., 823 (it must be evidence which persuades the judge that a jury would find him not guilty); [*Lombardo* v. *State*, 172 Conn. 391, 374 A.2d 1065 (1977)] (same); see also *Asherman* v. *State*, supra, 202 Conn. 434, 436 (considering whether admission probably would have led to petitioner's acquittal)." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Skakel* v. *State*, 295 Conn. 447, 466–68, 991 A.2d 414 (2010).

"One cogent reason for overturning the verdict of a jury is that the verdict is based on conclusions that are physically impossible. [A] verdict should be set aside [w]here testimony is thus in conflict with indisputable physical facts, the facts demonstrate that the testimony is either intentionally or unintentionally untrue, and leave no real question of conflict of evidence for the jury concerning which reasonable minds could reasonably differ." (Internal quotation marks omitted.) *State* v. *Whipper*, supra, 258 Conn. 247.

"It is within the discretion of the trial court to determine, upon examination of all the evidence, whether the petitioner has established substantial grounds for a new trial, and the judgment of the trial court will be set aside on appeal only if it reflects a clear abuse of discretion." *Asherman* v. *State*, supra, 202 Conn. 434. "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did." (Internal quotation marks omitted.) *State* v. *Orr*, 291 Conn. 642, 667, 969 A.2d 750 (2009). "[If an] appeal, however, raises the issue of whether the trial court correctly applied the standard for determining whether to grant a petition for a new trial as set forth in *Asherman* . . . our review is plenary."[13] *Shabazz* v. *State*, supra, 259 Conn. 820.

The only issue on appeal in this case is whether the petitioner satisfied the fourth and final element of the *Asherman* test: that the newly discovered evidence was likely to produce a different result if the petitioner were granted a new trial. We conclude that the trial court did not abuse its discretion in denying the petitioner's petition on the ground that he failed to prove that element.

We first note that we disagree with the court that the "pertinent nexus" between the jacket and the perpetrator was one of "possessor and occupancy of the victim's vehicle" rather than one of "garment and wearer." The identity of the man who wore the camouflage jacket retrieved by Harris from the dumpster after the shooting was of vital importance in this case. All eyewitnesses saw a man, identified by some as the petitioner, *wearing* a camouflage jacket at or about the time of his fatal altercation with the victim. Hodge testified that the man he saw *approaching* the victim's vehicle was wearing an army or flannel jacket. Harris' testimony that she watched the petitioner *take off* a camouflage jacket and

throw it in the dumpster provided a direct link between the jacket retrieved from the dumpster and the petitioner. That jacket, moreover, contained evidence linking its wearer to the victim, specifically the two year old repair bill for the victim's vehicle that was found in one of the jacket's pockets. Against this background, evidence tending to establish that the petitioner had never worn the jacket would have been immensely helpful to the defense in this case.

As the court aptly noted, however, the DNA evidence in this case did not tend to establish that the petitioner had never worn the jacket retrieved from the dumpster, much less that he had not worn it on the day of the victim's murder. Instead, it merely tended to show that none of the petitioner's testable DNA was found in the places swabbed on the jacket when it was examined for that purpose many years after the jacket was recovered from the dumpster. Although evidence was presented at the hearing on the petition for a new trial that the petitioner was wearing that very jacket just minutes before it was recovered by Harris from the dumpster, and that persons wearing the jacket could have deposited skin cells containing their nuclear DNA in those parts of the jacket that were swabbed by Lopes-Phelan, it also heard evidence explaining why the material recovered from the jacket might have contained none of the petitioner's DNA even if he did wear the jacket. Evidence was presented that some people are not "good" shedders of skin cells, and that even if they are, their wearing of other clothing under the jacket could prevent the transfer of their skin cells to the jacket. No testimony was presented as to what kind of shirt or other clothing the man identified as the petitioner was wearing on his upper body before or after he threw the jacket into the dumpster shortly after the shooting. Even, moreover, if some of the fleeing man's skin cells were shed into the jacket before he removed it and threw it away, such skin cells could have been lost or contaminated when the jacket was subjected to forensic testing in the early days of the police investigation and/or handled by police, court personnel, attorneys and jurors during the two trials of this case in the early 1990s. Indeed, the possible contamination of at least some of the DNA in the two tested samples of biological material collected from the jacket retrieved by Harris from the dumpster was confirmed in this case by the presence of telltale sloping in the charts depicting the results of nuclear DNA testing by the STR method. In light of these uncertainties as to the true significance of the absence of any testable DNA from the petitioner in the biological samples collected from the jacket, the court did not abuse its discretion in concluding that the petitioner failed to establish a reasonable probability that evidence of the new test results would probably lead to his acquittal if he were granted a new trial.

As for the fact that uncontaminated DNA from two

other individuals was found in the biological material collected from the swabbed areas inside the jacket, the exculpatory tendency of such evidence would necessarily depend upon establishing the high probability, if not the certainty, that material collected from those areas had been left there by the person who shot the victim. The evidence in this case did not establish when or how those other individuals may have deposited their DNA on the jacket. One of them, of course, could have done so by wearing the jacket at the time and place of the shooting. All others, of course, could not have done so, for only one person was wearing the jacket at that time and place. More importantly, perhaps, there is nothing about the collected material, or the circumstances in which it was found and collected, to suggest that it was probably deposited by the person who shot the victim. Unlike DNA left in a semen stain on a rape victim's recently washed clothing, which was very probably left by the rapist; cf. *State* v. *Hammond*, supra, 221 Conn. 280; or blood or tissue found in scrapings from the fingernails of a homicide victim who evidently resisted her attacker's efforts to subdue her, the DNA in this case, from skin cells deposited inside a jacket where wearers of garments typically deposit them, could have been left there by any wearer of the jacket at any time. Indeed, the evidence showed that they could even have been left there by a nonwearer who handled the jacket at some time before or after the jacket was retrieved from the dumpster. In light of this evidence, the court reasonably concluded that the proven presence of DNA from other persons in the biological material found inside the jacket had no logical tendency to exonerate the petitioner in connection with the victim's murder.

In a similar vein, evidence tending to establish that the petitioner was not in the victim's vehicle just prior to the homicide also would have been helpful to the defense. The mtDNA testing of hairs retrieved from the victim's vehicle, however, merely excluded the petitioner as the source of those particular hairs, and did not establish that the petitioner had not been inside the victim's vehicle. The petitioner argues that the fact that he was excluded as the contributor of the two unidentified Negroid type hairs supports his defense that the eyewitnesses misidentified him as the black man they saw arguing with the victim in or near the vehicle. However, here, as with the skin cells deposited inside the jacket, which Harris retrieved from the dumpster, mtDNA testing could not establish when those hairs were left in the victim's vehicle, and no evidence was presented from which a jury reasonably could have concluded that the victim had never had a black person inside his vehicle prior to the morning on which he was shot and killed. Indeed, the tested hairs could have been inside the victim's vehicle for a considerable period of time before the day of the shooting, for the evidence

presented at trial was that the victim's vehicle did not have a well-kept interior and did not look like it had recently been vacuumed. In light of that evidence, the court did not abuse its discretion in concluding that the presence in the victim's vehicle of two Negroid type hairs from persons other than the petitioner raised no doubt about the petitioner's guilt, let alone established that a new trial in which such evidence was presented would likely result in his acquittal.

Finally, the trial court properly evaluated the newly discovered DNA evidence in light of the evidence presented at trial. The court focused on the fact that the jury in this case believed the eyewitnesses who identified the petitioner as the perpetrator of the homicide over the eyewitnesses who testified that the petitioner was not the perpetrator. The lack of forensic evidence on the jacket or in the victim's vehicle does not contradict any eyewitness' account.

We are not persuaded that the newly discovered DNA evidence excluding the petitioner as the source of the hairs found in the victim's vehicle or of the biological material found on the jacket, considered in the context of all the evidence presented at the second trial of the underlying case, "would be likely to result in acquittal of the petitioner, not merely that it might cause one or more jurors to have a reasonable doubt about the petitioner's guilt." *Skakel* v. *State*, supra, 295 Conn. 468. Accordingly, the trial court did not abuse its discretion in denying the petitioner's petition for a new trial on the basis of newly discovered evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes (Rev. to 1989) § 53a-54b (3) provides: "A person is guilty of a capital felony who is convicted of any of the following . . . (3) murder committed by one who has previously been convicted of intentional murder . . . ." The petitioner was convicted of intentional murder in 1976. *State* v. *Jones*, 50 Conn. App. 338, 341 n.3, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).

[2] General Statutes (Rev. to 1989) § 29-35 (a) provides: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. The provisions of this subsection shall not apply to the carrying of any pistol or revolver by any sheriff, parole officer or peace officer of this state, or sheriff, parole officer or peace officer of any other state while engaged in the pursuit of his official duties, or federal marshal or federal law enforcement agent, or to any member of the armed forces of the United States, as defined by section 27-103, or of this state, as defined by section 27-2, when on duty or going to or from duty, or to any member of any military organization when on parade or when going to or from any place of assembly, or to the transportation of pistols or revolvers as merchandise, or to any person carrying any pistol or revolver while contained in the package in which it was originally wrapped at the time of sale and while carrying the same from the place of sale to the purchaser's residence or place of business, or to any person removing his household goods or effects from one place to another, or to any person while carrying any such pistol or revolver from his place of residence or business to a place or person where or by whom such pistol or revolver is to be repaired or while returning to his place of residence or business after the same has been repaired, or to any person carrying a pistol or revolver in or through the state for the purpose of taking part in competitions or

attending any meeting or exhibition of an organized collectors' group if such person is a bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any other state or subdivision of the United States, or to any person carrying a pistol or revolver to and from a testing range at the request of the issuing authority, or to any person carrying an antique pistol or revolver, as defined in section 29-33."

[3] The basis for the granting of the petition for a new trial was the newly discovered evidence of an additional eyewitness, Pasquale DeMaio.

[4] Our Supreme Court reversed the petitioner's conviction in his first trial because the trial court had failed to bifurcate the guilt phase of that trial to ensure that the jury would not learn of the petitioner's prior murder conviction, as required for proof of capital felony under § 53a-54b (3), before deciding if he was guilty of murder with respect to the victim or of carrying a pistol without a permit. *State* v. *Jones*, 234 Conn. 324, 348–51, 662 A.2d 1199 (1995).

[5] Mercado testified as follows: "[T]he [black] guy that . . . killed the white guy, he kept opening [the car door] and hitting [the white guy] on the throat . . . . The black guy was hitting him with the door, his head, I guess, he was laying . . . in the driver's with his head sticking out the door."

[6] Mercado testified at trial that the black male had a "few" braids. Her testimony was as follows:

"[The Prosecutor]: . . . [W]hat did the braids look like and how many approximately would you say there were?

"[Mercado]: I didn't—I couldn't count them, there were a few.

"[The Prosecutor]: Okay. And a few I take it you mean less than ten?

"[Mercado]: Yes."

[7] Delgado testified that the petitioner had braids, but did not specify the number of braids.

[8] The state also presented testimony that the size extra small jacket that the petitioner was wearing when the police arrested him also tested negative for gunshot residue or blood. The extra small jacket was lost prior to the start of the petitioner's first trial and never was admitted into evidence.

[9] The DNA samples were retested in 2012 due to possible manufacturing defects in the testing kits used in 2010. The results were the same in both tests.

[10] The victim was also excluded as the source of the two hairs that may have come from the same source. The third hair, which was a Caucasian hair, was consistent with the victim's hair.

[11] Although the respondent claims that it had not agreed prior to the evidentiary hearing that the evidence was not cumulative, on appeal, it is not pursuing a claim that the evidence was cumulative.

[12] We note that the petitioner's conviction after his first trial was reversed, and, accordingly, we give no weight to the fact that he was found guilty by the first jury.

[13] The petitioner and the respondent disagree on the appropriate standard of review in this case. The petitioner argues that we should apply de novo review pursuant to our Supreme Court's decision in *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 269, 112 A.3d 1 (2015). The respondent argues for the abuse of discretion standard.

In *Lapointe*, the habeas court was tasked with evaluating the materiality of a petitioner's claims under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 267. Our Supreme Court applied de novo review when assessing the habeas court's determination "that the testimony of the petitioner's experts, when viewed in light of [the respondent's expert's] testimony, was not sufficiently credible to give rise to a reasonable probability of a different result at the original trial . . . ." Id. Our Supreme Court concluded that the "habeas court's assessment of the testimony of [the petitioner's experts] was not predicated on their demeanor or conduct on the witness stand, nor was it related to anything else that would reflect adversely on their credibility, such as untruthfulness, bias, poor memory or substandard powers of observation. That assessment also was not dependent on any underlying factual findings requiring the trial court's firsthand observation and determination of the credibility or reliability of other witnesses. Rather, the . . . habeas court rejected the opinions of [the petitioner's experts] solely because, in its view, those opinions lacked an adequate foundation, first, because they were premised on facts that were contrary to the record in the case, as reported by [the respondent's expert], and, second, because the court did not credit the scientific underpinnings of those opinions. In such circumstances, when the habeas court's assessment of the expert testimony has nothing to do with the personal credibility of

the expert witness but instead is based entirely on the court's evaluation of the foundational soundness of the witness' professional opinion, this court is as well situated as the habeas court to assess that testimony for *Brady* purposes." Id., 268–69. Accordingly, the court "[saw] no reason to defer to the . . . habeas court's predictive or probabilistic judgment as to whether the original jury reasonably might have credited the testimony of the petitioner's experts." Id., 272.

Our Supreme Court limited its holding in *Lapointe* in several ways. First, it stated that "[its] conclusion [was] limited to the kind of fact-finding that is implicated in the *Brady* context." Id., 272 n.42. The court noted, however, that an appeal from a petition for a new trial "requires exactly the same analysis as claims under *Brady* and *Strickland* . . . ." Id., 308. In fact, in reaching its decision in *Lapointe*, it relied on an Indiana Court of Appeals decision reviewing the denial of a petition for a new trial on the basis of newly discovered evidence. Id., 269–70. Second, our Supreme Court emphasized that it is only in rare cases that an appellate court should apply de novo review to assessments of expert testimony, and that those cases must be factually similar to *Lapointe*. See id., 307.

The petitioner argues that *Lapointe* extends to this case because the court here was not required to make a credibility assessment of the expert testimony and merely applied the law of *Asherman* by determining whether the new evidence was likely to produce a different result at a new trial. The respondent, however, claims that *Lapointe* does not apply because the trial court here, unlike the court in *Lapointe*, determined that the DNA evidence was credible.

We agree with the respondent that this case is not one of the rare cases, factually similar to *Lapointe*, that require de novo review. Unlike the habeas court in *Lapointe*, the trial court here did not have to evaluate the testimony of various experts with differing opinions. The experts in this case merely testified as to the methods employed in performing STR and mtDNA testing and the results of those tests. The trial court found that the DNA testing methods employed in this case were "scientifically appropriate, that the methods were expertly executed, and that the outcomes obtained were accurate." In other words, even though the trial court "determine[d] that the evidence [was] sufficiently credible," it ultimately decided that "if a second jury were to consider it together with all of the original trial evidence, it probably would [not] yield a different result . . . ." *Shabazz* v. *State*, supra, 259 Conn. 827–28.

_____