D'AURIA, J.
*537 Opinion **86 In October, 1990, the petitioner, Melvin Jones, was arrested and charged with the murder of **87 Wayne Curtis, who had been found shot to death in New Haven just a few days before the petitioner's arrest. The case was tried to a jury, which found the petitioner guilty. Nearly twenty years after the crime occurred, in 2010, certain pieces of evidence from the petitioner's trial were tested for the presence of DNA pursuant to an agreement with the state. He later relied on that testing to petition for a new trial on the basis of newly discovered evidence. In his petition, he claimed that the new DNA testing demonstrated that he did not commit the murder. The trial court disagreed, concluding that the new DNA results, although valid, failed to establish that the new evidence would likely produce a different result in a new trial. The Appellate Court, reviewing the trial court's decision for an abuse of discretion, upheld that decision. Jones v. State , 165 Conn. App. 576, 604, 140 A.3d 238 (2016).
In his certified appeal to this court, the petitioner contends that the Appellate Court should have engaged in a de novo review of whether the new evidence was likely to produce a different result. He argues that de novo review is appropriate because the credibility of the new evidence is undisputed, requiring only the application of the legal standards to the facts found by the trial court. He further asserts that, had the Appellate Court properly engaged in a de novo review, it would have decided the case in his favor.
We agree with the petitioner that de novo review is appropriate in the specific circumstances of this case, namely, when the petition for a new trial is decided by a judge who did not preside over the original trial and no fact-finding was necessary because both parties agreed that the new evidence was fully credible. Applying a de novo standard of review, we nevertheless disagree that the petitioner is entitled to a new trial. We therefore affirm the Appellate Court's judgment.
**88 I
FACTUAL AND PROCEDURAL HISTORY
The following facts from the petitioner's criminal trial and new trial proceedings are relevant to this appeal. On October 17, 1990, police officers were called to Howard Avenue in New Haven where they found Wayne Curtis shot to death in the driver's seat of his car, which was parked on the street. The victim had a bullet wound through his abdomen and several head wounds from blunt force trauma. Police investigators found blood-stains on the victim's clothing and on the interior of the car, including on the driver's side door. At the petitioner's criminal trial, a witness testified that he saw the petitioner wearing a camouflage jacket and standing outside the victim's car, arguing with the victim, shortly before he heard gunshots. Another witness who was a few blocks away from the crime scene testified that, shortly after hearing gunshots, she saw the petitioner, whom she recognized from the neighborhood, run to a dumpster, take off a camouflage jacket and throw it into the dumpster.
*538 She recovered the jacket and later gave it to the police. In the pocket of the jacket, officers found a receipt for mechanical work done on the victim's car two years earlier. The jacket was tested for blood and for gunshot residue, but the tests returned negative results for the presence of either. The police examined the victim's car but found no fingerprints or hair from the petitioner.
The petitioner was first tried for the murder and found guilty by a jury in 1992 (first criminal trial). This court later reversed the judgment of conviction and ordered a retrial.[1] State v. Jones , 234 Conn. 324, 359, 662 A.2d 1199 (1995).
**89 The retrial was held in March, 1996 (second criminal trial). At his second criminal trial, the petitioner presented testimony from a new witness who claimed that he saw the shooting and that the petitioner was not the shooter. The jury nevertheless found the petitioner guilty of the victim's murder[2] and of carrying a pistol without a permit. The trial court sentenced the petitioner to a total effective sentence of life imprisonment without the possibility of release. The Appellate Court upheld the petitioner's conviction and sentence. State v. Jones , 50 Conn. App. 338, 369, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).
In 2010, the petitioner sought, and the state agreed to, DNA testing of the jacket recovered from the dumpster and of the hairs found in the victim's car using techniques not available at the time of his second criminal trial. The test of the jacket identified a mixture of DNA material from multiple contributors. The victim and the petitioner were both excluded as contributors to the mixture. The petitioner also was excluded as the source of the hairs tested.
On the basis of this new evidence, the petitioner filed a petition for new trial based on newly discovered evidence. He claimed that the new DNA evidence established that he had not worn the jacket linked to the victim, but that others had, demonstrating that he was not the perpetrator of the crime. In support of his petition, he presented the testimony of two forensic examiners from the Department of Emergency Services and Public Protection, Division of Scientific Services (state forensic science laboratory), who performed the DNA analysis on the jacket. The petitioner's witnesses confirmed the results of the testing but also explained that **90 a lack of any of the petitioner's DNA on the jacket did not establish that the petitioner had never worn or touched the jacket. The jacket was tested only for "wearer DNA" by swabbing the inside cuffs and collar of the jacket. Additionally, the witnesses testified that any DNA previously deposited on the jacket could have degraded over time and that the mixture of the DNA that was detected from other individuals could have been deposited by anyone who had touched the areas of the jacket that were tested, including investigators, forensic personnel who originally examined the jacket for gunshot residue, attorneys, court personnel, and jurors. In addition to these two witnesses, the petitioner also presented a DNA test report indicating that certain hairs taken from *539 the victim's vehicle did not come from the petitioner.
The state did not present any witnesses or dispute the testimony of the petitioner's witnesses. The state, instead, argued that the petitioner's evidence failed to establish a probability of a different result in a retrial because the test results neither established that the petitioner had never touched the jacket nor established that one of the persons who contributed to the DNA mixture found on the jacket was the perpetrator of the crime.
The trial court denied the petition. The court first determined that the new evidence met the first three elements for granting a new trial in that the evidence was (1) newly discovered, (2) material to the issues at trial, and (3) not cumulative. See Asherman v. State , 202 Conn. 429, 434, 521 A.2d 578 (1987). The court further concluded, however, that the petitioner had failed to establish that the new evidence would probably produce a different result in a new trial, the fourth and final element required for the granting of a new trial. See id. In its analysis, the court credited the conclusions presented by the petitioner's witnesses, finding that **91 "the methods used to perform the DNA analyses were scientifically appropriate, that the methods were expertly executed, and that the outcomes obtained were accurate." The court observed that the absence of a DNA match to the petitioner or the victim "does not, of course, necessarily imply that neither had contact with the jacket or that the petitioner was never in the victim's car. The results simply demonstrate [that] their DNA was not detected on or in the items tested." The trial court determined that the new evidence would not impact the outcome of the case because the lack of any forensic link to the petitioner had already been argued at the second criminal trial, and the jury had found the petitioner guilty on the basis of eyewitness testimony despite the lack of any supporting physical evidence. The court lastly explained that the state would be able to argue, in a new trial, that the lack of the petitioner's DNA on the jacket could be the result of a number of factors, including that any DNA deposited could have substantially degraded or have been removed by earlier forensic testing and that the discovery of other DNA profiles on the jacket could be the result of handling by other persons in the decades after the crime occurred. The trial court later granted a request by the petitioner to appeal the trial court's decision pursuant to General Statutes § 54-95(a).
The Appellate Court upheld the denial of the petition. Jones v. State , supra, 165 Conn. App. at 604, 140 A.3d 238. In his arguments to the Appellate Court, the petitioner asserted that the court should not defer to the trial court's conclusions on whether the new evidence would produce a different result but should review that aspect of the trial court's decision de novo and conclude that he is entitled to a new trial. Id., at 598-600 n.13, 140 A.3d 238. The Appellate Court disagreed that de novo review was appropriate. Id., at 599 n.13, 140 A.3d 238. It instead applied the abuse of discretion standard and concluded that the trial court had not **92 abused its discretion in denying the petition for a new trial. Id., at 600, 140 A.3d 238.
We granted certification to appeal on the following question: "Did the Appellate Court properly determine that its review of the decision of the [trial] court is limited to abuse of discretion as distinguished from de novo review?" Jones v. State , 322 Conn. 906, 140 A.3d 977 (2016).[3]
*540 II
STANDARD OF REVIEW
The petitioner first asserts that, contrary to the Appellate Court's conclusion and our prior case law, the trial court's determination that the newly discovered evidence is unlikely to produce a different result should be reviewed de novo. The petitioner's claim for de novo review is premised upon the fact that the parties do not dispute the credibility of the petitioner's new evidence, only its impact on the second criminal trial evidence, and the judge hearing the new trial petition did not preside over the second criminal trial. We agree that de novo review of the trial court's application of the legal standard is appropriate in these circumstances.
Our cases establish that, to obtain a new trial on the basis of newly discovered evidence, the petitioner must establish that the newly proffered evidence (1) is actually newly discovered, (2) would be material in a new trial, (3) is not merely cumulative, and (4) would probably produce a different result in a new trial. Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578. This standard is strict and is "meant to effectuate the underlying equitable **93 principle that once a judgment is rendered it is to be considered final, and should not be disturbed by post-trial [proceedings] except for a compelling reason." (Internal quotation marks omitted.) Id. The parties in the present case do not dispute that the petitioner's new DNA evidence meets the first three elements for granting a new trial. They disagree only on the fourth Asherman element, namely, whether it would produce a different result in a new trial.
To meet the fourth element of Asherman , "[t]he [petitioner] must persuade the court that the new evidence he submits will probably , not merely possibly, result in a different verdict at a new trial .... It is not sufficient for him to bring in new evidence from which a jury could find him not guilty-it must be evidence which persuades the judge that a jury would find him not guilty." (Citation omitted; emphasis in original.) Lombardo v. State , 172 Conn. 385, 391, 374 A.2d 1065 (1977) ; see also Skakel v. State , 295 Conn. 447, 468, 991 A.2d 414 (2010). This analysis requires the trial court hearing the petition to weigh the impact the new evidence might have on the original trial evidence. See Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578.
The petitioner has not asked us to revisit the underlying standard requiring a probability of a different result but has asserted that this court should review the trial court's weighing process anew, without deference to the trial court's decision. This claim requires us to examine our standard of review for a trial court's decision on a petition for a new trial based on newly discovered evidence.
A
Abuse of Discretion Standard of Review
We have repeatedly observed that a trial court's decision granting or denying a petition for new trial, including **94 on the ground of newly discovered evidence, is a matter of discretion for the trial court and is reviewable only for an abuse of discretion. Skakel v. State , supra, 295 Conn. at 468, 991 A.2d 414 ; Shabazz v. State , 259 Conn. 811, 820, 792 A.2d 797 (2002) ; *541 Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578 ; Kubeck v. Foremost Foods Co. , 190 Conn. 667, 669-70, 461 A.2d 1380 (1983). This includes deference to the trial court's process of weighing the impact of the new evidence on the original trial evidence. Skakel v. State , supra, at 487 n.25, 991 A.2d 414 ("[f]or more than one century, it has been settled law that an abuse of discretion standard applies not only to the trial court's ultimate decision whether to grant the petition for a new trial, but also to its subsidiary determinations in support of that decision"); Pradlik v. State , 131 Conn. 682, 686, 41 A.2d 906 (1945) (in weighing impact of new evidence, "the court compares the old testimony with the new and decides, in the exercise of a sound discretion ... whether the newly discovered evidence is likely to change the result" [internal quotation marks omitted] ).
Our deference to the trial court traces to some of our earliest cases. This court originally considered judgments on petitions for a new trial to be discretionary and not subject to review for error whatsoever, regardless of the grounds claimed to justify a new trial. See, e.g., Lewis v. Hawley , 1 Conn. 49, 50 (1814) ("A petition for a new trial on the ground of ... newly discovered evidence is an address to the sound discretion of the court.... These are to be tested by the discretion of the court, of which error is not predicable."); see also Magill v. Lyman , 6 Conn. 59, 60 (1825) ("[i]t has been so frequently, and so recently, decided by this [c]ourt, that the granting or refusing of a new trial, is entirely a matter of discretion, and is not the subject of error, that it cannot now be questioned"); Kimball v. Cady , 1 Kirby (Conn.) 41, 43 (1786) ("[i]f the petition was for a new trial, it was [a] matter of discretion with the court **95 to which it was preferred, to grant or negative, and error cannot be predicated upon such decision"). This court later determined, however, that decisions granting or denying a petition for a new trial could be reviewed for error. Husted v. Mead , 58 Conn. 55, 60, 66-67, 69, 19 A. 233 (1889) (reviewing and reversing trial court decision granting new trial because of newly discovered evidence). This court expressly articulated an abuse of discretion standard for appeals involving new trial petitions in Gannon v. State , 75 Conn. 576, 578-79, 54 A. 199 (1903). We have applied that standard ever since. See, e.g., Skakel v. State , supra, 295 Conn. at 468, 487 n.25, 991 A.2d 414.
Many of our decisions regarding new trial petitions cite the abuse of discretion standard without expounding on the reasons that support treating the trial court's decision as discretionary. See, e.g., id. ; Shabazz v. State , supra, 259 Conn. at 820, 792 A.2d 797 ; Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578 ; Kubeck v. Foremost Foods Co. , supra, 190 Conn. at 669-70, 461 A.2d 1380 ; Lombardo v. State , supra, 172 Conn. at 390, 374 A.2d 1065 ; Pradlik v. State , supra, 131 Conn. at 686, 41 A.2d 906 ; Gannon v. State , supra, 75 Conn. at 578-79, 54 A. 199 ; Magill v. Lyman , supra, 6 Conn. at 60 ; Kimball v. Cady , supra, 1 Kirby (Conn.) at 43.
Nevertheless, a close review of our case law reveals that our deference to the trial court appears to arise historically and primarily from two considerations: (1) the trial judge's superior opportunity to assess the strength of the original trial evidence; and (2) the trial court's role as the arbiter of credibility.
First, when the judge hearing the new trial petition also presided over the original trial, that judge is unquestionably better suited to assess the impact of the newly discovered evidence in light of the evidence originally presented at trial. The trial judge, having seen the original evidence presented as the jury did, will have *542 a better understanding of how the new evidence might impact **96 a new jury's assessment of the original trial evidence and whether the new evidence would likely change the result. Thus, we explained in Lewis v. Hawley , supra, 1 Conn. at 50, that "[a] petition for a new trial on the ground of surprise and newly discovered evidence is an address to the sound discretion of the court. The court in fact [is] presumed to possess the whole of the testimony offered on the trial. They have a full view of the case as it appeared to them; with which they are to compare the surprise and newly discovered evidence stated ...." Id. ; see Gannon v. State , supra, 75 Conn. at 579, 54 A. 199 ("The court before which the first trial was had, upon the facts thus presented for its consideration, refused to grant a new trial. That action cannot be reviewed, unless it appears that the court plainly abused its discretion or misjudged the limits of its discretionary power."); see also State v. McIntyre , 250 Conn. 526, 533, 737 A.2d 392 (1999) ("Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided.... Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court ...." [Citation omitted; internal quotation marks omitted.] ).
Second, the trial court hearing a petition for a new trial has the responsibility of assessing the credibility of the newly discovered evidence when determining the likelihood that the new evidence would produce a different result. See, e.g., Shabazz v. State , supra, 259 Conn. at 822-28, 792 A.2d 797 ; Lombardo v. State , supra, 172 Conn. at 390-91, 374 A.2d 1065 ; Pradlik v. State , supra, 131 Conn. at 686, 41 A.2d 906. This responsibility arises not only from the superior vantage point of the trial court, but also from its role as the final arbiter of questions of credibility and fact. Shabazz v. State , supra, at 827-28, 792 A.2d 797 ; see also Skakel v. State , supra, 295 Conn. at 487 n.25, 991 A.2d 414 (noting trial court's role as fact **97 finder and deference shown by this court to that role); State v. Lawrence , 282 Conn. 141, 156-57, 920 A.2d 236 (2007) (same); Smith v. State , 141 Conn. 202, 214, 104 A.2d 761 (1954) (upholding trial court's conclusion that new witness was not credible).
We have recognized that whether the new evidence would produce a different result at a new trial often will depend on the degree of credibility that the new evidence has. Shabazz v. State , supra, 259 Conn. at 822-24, 792 A.2d 797. In Shabazz , we explained that whether new evidence would change the result of the trial often turns not just on whether a new jury could credit, for example, a new witness, but whether the jury would find the new witness' testimony sufficiently credible that it would be persuaded to reach a different result. Id., at 823, 792 A.2d 797. In such cases, the trial court's credibility assessment and determination of the likelihood of a different result are tied together, essentially as one analysis, and the trial court must make a predictive judgment about whether a new jury would find the new witness so credible that it would be persuaded to reach a different result. Id., at 827-28, 792 A.2d 797 ("[i]f ... the trial court determines that the evidence is sufficiently credible so that, if a second jury were to consider it together with all of the original trial evidence, it probably would yield a different result or otherwise avoid an injustice, the fourth element of the Asherman test would be satisfied"). When the newly discovered evidence is in the form of witness testimony, the trial court must typically fulfill its role to assess the credibility *543 of that new evidence by receiving the witness' new testimony first hand, in court. Adams v. State , 259 Conn. 831, 842, 792 A.2d 809 (2002).
Because the role of determining the credibility of the new evidence falls on the trial court, we have traditionally deferred to its ultimate conclusion on credibility and the likelihood of a different result. For instance, in Skakel , whether evidence from a new witness would **98 change the result depended on the credibility that could be given to the new evidence. Skakel v. State , supra, 295 Conn. at 486-87, 991 A.2d 414. Consistent with Shabazz , we deferred to the trial court's credibility assessment and determination of whether the new evidence would change the result, even though the new evidence was presented in the form of a video recording. Id., at 470, 487 n.25, 991 A.2d 414. We therefore applied the long-standing abuse of discretion standard and concluded that the trial court's denial of the petition in that case was reasonable. Id., at 452, 468, 991 A.2d 414.
B
De Novo Standard of Review Under the Circumstances in the Present Case
In the present case, however, these traditional reasons for our deference to the trial court's discretion are not implicated, leading us to conclude that it is more appropriate to apply a de novo standard of review, despite our prior case law establishing an abuse of discretion standard.
First, the trial judge deciding the petition did not preside at the petitioner's second criminal trial, and, therefore, did not enjoy any superior opportunity to assess the credibility and strength of the second criminal trial evidence. Any assessment of that evidence by the trial judge deciding the new trial petition must therefore be made from a review of the printed trial transcripts and exhibits. This traditional consideration thus provides no basis for deferring to the trial court's assessment in the present case.
Second, unlike the context in Shabazz , the result under the fourth Asherman element in the present case does not turn on the degree of credibility of the new evidence. Cf . Shabazz v. State , supra, 259 Conn. at 828, 792 A.2d 797. The parties do not dispute the credibility a jury might attach to the testimony from the new witnesses concerning **99 the DNA evidence, nor do they contend that the degree of their credibility might alter the outcome. Rather, both parties' arguments presuppose that a jury would fully credit the new testimony. The petitioner's witnesses, both of whom were employed as forensic examiners by the state, testified concerning the methods they applied to test certain evidence for DNA material, the results of those tests, and the scientifically supported conclusions that might be drawn from those test results. The trial court credited the methods applied and the conclusions reached by the petitioner's expert witnesses. Neither of the parties disputed the credibility of these witnesses or their conclusions, and both parties rely on the witnesses' testimony to make their respective arguments to this court.
This case, therefore, does not present the same circumstances present in Shabazz and Skakel , which required the trial court to assess how credible a new jury might find the new evidence when considered alongside the original trial evidence. See Skakel v. State , supra, 295 Conn. at 467-68, 486-87, 991 A.2d 414 ; Shabazz v. State , supra, 259 Conn. at 827-28, 792 A.2d 797. Nor do the circumstances of this case require this court to resolve disputes concerning the credit a jury is likely to give to competing expert witness opinions, a question we have reviewed de novo only in *544 limited circumstances. See Lapointe v. Commissioner of Correction , 316 Conn. 225, 268-69, 112 A.3d 1 (2015).
Instead, all that remains to consider under the fourth element of Asherman is whether, in light of this new, credible evidence, a new jury would likely reach a different result-a question that requires the application of a legal standard to the established facts of this case. Although we have described new trial proceedings as generally equitable in nature inasmuch as they promote principles of fairness by permitting relief from potentially unjust judgments; Black v. Universal C.I.T. Credit Corp. , 150 Conn. 188, 192-94, 187 A.2d 243 (1962) ; the **100 question remaining in the present case does not call for the exercise of the trial court's equitable discretion in a traditional sense. "The very core consideration of choice in discretion logically means that neither party is absolutely entitled to have that discretion exercised in its favor." State v. S & R Sanitation Services, Inc. , 202 Conn. 300, 311, 521 A.2d 1017 (1987). Discretion implies that the trial court has a broad choice in deciding the matter before it, usually reached by balancing competing interests or multiple factors and resolving disputed factual issues-a process no doubt aided by the trial court's superior opportunity to view the proceedings. See, e.g., Misthopoulos v. Misthopoulos , 297 Conn. 358, 372, 377-78, 999 A.2d 721 (2010) (trial court's distribution of marital property in dissolution proceeding, which requires resolving disputed facts and weighing several statutory factors, is reviewed for abuse of discretion); see also State v. Jones , 314 Conn. 410, 419, 102 A.3d 694 (2014) (noting trial court's discretion over matters of trial management).
The question remaining in the present case does not require the balancing of competing interests or factors, nor does it implicate the trial court's fact-finding role. Rather, applying the fourth Asherman element in the present case calls for a determination of whether the petitioner is entitled to a new trial when the legal standard is applied to the established facts. If the new evidence is unquestionably credible and likely to produce a different result, then the petitioner is entitled to a new trial, and a trial court does not have discretion to deny the petition. See Shabazz v. State , supra, 259 Conn. at 827-28, 792 A.2d 797 (if trial court concludes new evidence is sufficiently credible to produce different result, fourth Asherman element is satisfied). To be sure, judges often disagree on the correct outcome under the governing legal standard, but that room for disagreement does not, in itself, convert a question of law into an exercise **101 of discretion. See, e.g., Anderson v. Commissioner of Correction , 313 Conn. 360, 375, 392, 380, 98 A.3d 23 (2014) (applying plenary review to Strickland prejudice analysis, concerning reasonable probability of different result, even though majority and dissenting opinion disagreed about proper outcome), cert. denied sub nom. Anderson v. Semple , --- U.S. ----, 135 S.Ct. 1453, 191 L.Ed.2d 403 (2015).
In these circumstances-when the judge deciding the new trial petition did not preside over the original trial and the likelihood of a different result does not depend on how credible the new evidence appears-we conclude the fourth Asherman element becomes a mixed question of law and fact; we defer to any factual findings and credibility determinations made by the trial court, but we review the legal import of those findings de novo. See, e.g., State v. Ortiz , 280 Conn. 686, 720-22, 911 A.2d 1055 (2006) (describing standard of review for mixed question of law and fact). Ordinarily, when the facts are undisputed, determining the legal import of those facts presents a question of law subject to de *545 novo review. See, e.g., One Country, LLC v. Johnson , 314 Conn. 288, 300, 101 A.3d 933 (2014) (when "facts are undisputed," application of legal standard is "question of law over which we exercise plenary review"); Connecticut Light & Power Co. v. Dept. of Public Utility Control , 219 Conn. 51, 62, 591 A.2d 1231 (1991) ("because the underlying facts are undisputed, leaving only a determination of the legal effect of those facts," issue presents "a question of law" and appellate review is de novo); Steelcase, Inc. v. Crystal , 238 Conn. 571, 577, 680 A.2d 289 (1996) (when parties stipulate to facts, inferences that may be drawn from facts present question of law and review of trial court's decision is plenary). This is so even in the context of fact laden disputes ordinarily subject to a trial court's discretion. See **102 Crews v. Crews , 295 Conn. 153, 164, 989 A.2d 1060 2010) (In family law cases, "[the] abuse of discretion standard applies only to decisions based solely on factual determinations made by the trial court.... When the trial court conducts a legal analysis or considers a mixed question of law and fact, plenary review is appropriate, even in the family law context." [Citations omitted.] ). We therefore may apply the fourth Asherman element to this case de novo without encroaching on the deference we afford to the trial court's role as the arbiter of credibility and finder of facts.
In fact, the standard of review we apply in the present case is no different from that applied to claims of prejudice under Strickland v. Washington , 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and materiality under Brady v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) -an analysis that is similar to the fourth element of Asherman . The Strickland prejudice/ Brady materiality standard requires a showing that there is a reasonable likelihood that the outcome of the proceeding would have been different if no constitutional violation had occurred. Cone v. Bell , 556 U.S. 449, 474, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009) ; Strickland v. Washington , supra, at 694, 104 S.Ct. 2052. We have previously noted that addressing the fourth Asherman element entails "exactly the same analysis as claims under Brady and Strickland , as they entail the same considerations." Lapointe v. Commissioner of Correction , supra, 316 Conn. at 308, 112 A.3d 1. Both require the court to assess the impact that changed circumstances-e.g., the introduction of either newly discovered or withheld evidence-might have on the result of the original trial. The only significant difference between the two standards is the level of certainty that the outcome of the proceeding would be different. Id., at 308 n.62, 112 A.3d 1. In Strickland and Brady , there must be a "reasonable likel[ihood]" of a different result, a standard that is slightly more lenient than the more likely than not standard **103 required for newly discovered evidence claims. (Internal quotation marks omitted.) Harrington v. Richter , 562 U.S. 86, 111-12, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011).
In State v. Ortiz , supra, 280 Conn. at 720-22, 911 A.2d 1055, we concluded that a Brady materiality determination presents a mixed question of law and fact-we defer to the trial court's factual and credibility findings, but review its application of the legal standard de novo. Id. In doing so, we distinguished prior cases that had applied an abuse of discretion standard and directed de novo appellate review in future cases. Id. We also noted that we will give great weight to an assessment of materiality when the judge deciding a Brady claim also presided at the original trial. Id., at 721-22, 911 A.2d 1055. We address claims of prejudice under Strickland with the same standard of review.
*546 Small v. Commissioner of Correction , 286 Conn. 707, 717, 946 A.2d 1203, cert. denied sub nom. Small v. Lantz , 555 U.S. 975, 129 S.Ct. 481, 172 L.Ed.2d 336 (2008).
Applying the de novo standard of review in the present case thus would be consistent with our Strickland and Brady standards of review. Indeed, if the very same DNA results in this case had been in the state's possession and not disclosed to the defendant-a potential Brady claim-or in defense counsel's possession but not introduced at trial-a potential Strickland claim-under our precedents in Ortiz and Small we would have reviewed the trial or habeas court's determination of the likelihood of a new outcome using a de novo standard of review. We see no principled reason why we should apply a different standard of review to an identical analysis simply because of the procedural mechanism used to bring the issue before the courts.
In her concurring opinion, Justice Espinosa asserts that we should nevertheless defer to the trial court's **104 discretion on a petition for new trial in the interest of promoting finality of the underlying judgment that a petitioner seeks to overturn. We agree that the impact of new trial petitions on the finality of judgments merits serious consideration. But we believe that concerns of finality are already appropriately accounted for in the substantive standard required to obtain a new trial-a standard we have already acknowledged as "strict" inasmuch as it requires proof of a probability, not just a reasonable possibility, of a different result. Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578. In our view, interests of finality are better addressed by the substantive standard required to obtain a new trial rather than through a narrower appellate standard of review. In fact, an abuse of discretion standard might prevent an appellate court from vindicating interests of finality when, for example, a trial court grants a petition and sets aside a judgment, but an appellate panel is nevertheless convinced that, if reviewed de novo, the petition should have been denied and the underlying judgment left intact.
In sum, we are persuaded that we should review de novo the trial court's conclusion on the fourth Asherman element when (1) the judge hearing the petition for a new trial did not preside at the original trial, and (2) the trial court found, or the parties agree, that a new jury would credit the new evidence and that the only question remaining is whether, in light of that new evidence, a new jury hearing the case would probably reach a different result.[4] To the extent that our prior decisions have established that an abuse of discretion standard of review would be appropriate in such circumstances, they are overruled in favor of a de novo standard of review. Our traditional abuse of discretion **105 standard continues to apply, however, in any case when the judge hearing the new trial petition also presided at the original trial or when the likelihood of a different result depends on the degree of credibility that may be given to the new evidence. See, e.g., Skakel v. State , supra, 295 Conn. at 467, 991 A.2d 414.
C
New Trial Statute
The state nevertheless argues that, under the statute that authorizes a petition for a new trial based on newly *547 discovered evidence, General Statutes § 52-270, our review is limited to whether there has been an abuse of discretion. We disagree that the legislature intended for this statute to limit the scope of appellate review.
Petitions for a new trial based on newly discovered evidence are governed by statute. See, e.g., Wojculewicz v. State , 142 Conn. 676, 677, 117 A.2d 439 (1955) ("[p]roceedings in this state for procuring a new trial, whether in a civil or a criminal case, are controlled by statute"). Section § 54-95(a) authorizes defendants in criminal cases to file petitions for new trials in the same manner as in civil cases, and General Statutes § 52-270(a), which governs new trials in civil actions, provides in relevant part: "The Superior Court may grant a new trial of any action that may come before it, for ... the discovery of new evidence ... or for other reasonable cause, according to the usual rules in such cases ...." (Emphasis added.)
The state relies upon the emphasized language in § 52-270 to argue that the legislature intended the statute to provide the Superior Court the exclusive authority to grant new trials within that court's sole discretion, limiting any appellate review to an abuse of that discretion. We think this reads far too much into the statutory language.
**106 We interpret the emphasized language as intending to simply vest the Superior Court with authority to grant new trials, not to limit the scope of any appellate review in such cases. See Zaleski v. Clark , 45 Conn. 397, 401-402 (1877) (prior to original enactment of new trial statute in 1762, General Assembly had sole authority to grant new trials). Indeed, § 52-270 makes no reference to appeals. Petitions for a new trial in criminal cases are treated in the same manner as in civil proceedings, and a judgment on the petition is subject to appeal under General Statutes §§ 52-263 and 54-95(a). See, e.g., State v. Asherman , 180 Conn. 141, 142-43, 429 A.2d 810 (1980). Neither statute purports to limit our standard of review. Section 54-95(a) does, however, place limits on when a petitioner may appeal from the denial of a petition for a new trial, requiring the petitioner to first obtain certification from the trial court that the case involves a question that "ought to be reviewed by the Supreme Court or by the Appellate Court...." General Statutes § 54-95(a). But nothing in that section limits the scope of appellate review once certification is obtained.
In addition, none of our cases reviewing the trial court's decision on a petition for new trial for an abuse of discretion has indicated that our standard of review is tied to the language in § 54-95(a) on which the state relies. This court has not limited its review to an abuse of discretion standard either when determining the substantive standards the trial court must apply when deciding a petition for new trial or when considering whether the trial court applied the proper standard. See, e.g., Shabazz v. State , supra, 259 Conn. at 820, 792 A.2d 797 ("[T]ypically, we review a trial court's decision with respect to a petition for a new trial for an abuse of discretion.... This particular appeal, however, raises the issue of whether the trial court correctly applied the standard for determining whether to grant a petition for a new **107 trial as set forth in Asherman v. State [supra, 202 Conn. at 434, 521 A.2d 578] to the petition at issue. Because this issue presents a question of law, our review is plenary." [Citation omitted.] ); see also Adams v. State , supra, 259 Conn. at 837, 792 A.2d 809 (whether trial court applied appropriate standard when deciding petition is question of law subject to plenary review). We doubt the legislature intended *548 the language in § 54-95(a) emphasized by the state to establish that this court may set the substantive standards for granting new trials for newly discovered evidence and review de novo whether the trial court applied the proper standard but, nevertheless, to limit our review of whether the trial court properly applied those standards to an abuse of discretion standard of review. For these reasons, we are not persuaded that the statutory language relied on by the state was intended to operate as a limit to the scope of appellate review.
III
ANALYSIS UNDER THE FOURTH ASHERMAN ELEMENT
The petitioner next contends that the new evidence he has presented, if presented at a new trial, would lead to a different result. We disagree.
Before turning to the reasons for our decision, we first recount in greater detail the critical evidence presented at the petitioner's second criminal trial and the newly discovered evidence.
A
Second Criminal Trial Evidence
The state's case against the petitioner consisted primarily of eyewitnesses placing the petitioner, or someone resembling him, near or with the victim on the morning of the murder and around the time of the shooting.
**108 The New Haven Police Department received a call on October 17, 1990, at about 7:27 a.m. reporting a shooting on Howard Avenue. Upon arriving at the scene, an officer discovered a car parked in front of a house on Howard Avenue. Inside the car, the officer found the victim dead in the driver's seat. The victim had blood on him from wounds to his head and abdomen. Blood was also found on the interior side of the driver's side door and window.
Larry Hodge, who at the time of the second criminal trial was incarcerated for a burglary conviction, testified that the victim had given him a ride earlier in the morning on the day of the murder. Hodge explained that he saw the victim at a gas station in New Haven at about 5 a.m. that morning, paying for gas with pennies. Hodge, a drug user, believed that the victim was on drugs, likely cocaine. Hodge asked the victim for a ride to another place in New Haven and offered to pay him for it. The victim took Hodge to his destination, which was near a highway underpass. As Hodge got out of the car at about 5:30 a.m., he heard someone call to the victim. The person calling to the victim emerged from the underpass and walked toward the car. Hodge described the person as a black male wearing a camouflage jacket with braids in his hair. Several hours later, Hodge saw the victim's car depicted in a television news report of the murder. He called a police detective he was familiar with because he was concerned that investigators would find his fingerprints in the vehicle and suspect him of committing the murder.
Hodge testified that he did not see in the courtroom that day the person whom he saw call out to the victim. But the state presented evidence that, in the days after the murder, police investigators had interviewed Hodge, and he identified the petitioner as the person he saw from a twelve person photographic array. The state also presented evidence that Hodge had previously **109 approached investigators and the State's Attorney's Office to report that he had been threatened by people who wanted *549 him to change his story about the case.[5] Hodge had also failed to appear to give testimony at a prior proceeding in this case, despite a subpoena requiring his presence, and the police had to arrest him and bring him to court to testify. There was also some evidence that, about one-half hour prior to Hodge's testimony, the state's attorney had met with him and asked him if he intended to tell the truth. Hodge responded only by stating that he had not received early release from his incarceration for his burglary conviction.
Another witness, Bonaventure Console III, lived on Howard Avenue when the murder occurred. He testified that, before the day of the shooting, he had routinely seen the petitioner in the neighborhood when leaving for work in the morning and sometimes in the afternoon, and he had spoken to the petitioner once when the petitioner tried to sell him some tapes. Console testified that, when he saw the petitioner in the neighborhood, he had braids in his hair and frequently wore camouflage clothing. On the morning of the murder, Console left his house for work at about 6:30 to 6:45 a.m., about forty-five minutes to one hour before the call reporting the murder. While on his way out, he saw the victim's car parked on Howard Avenue and noticed someone in the driver's seat moving. As he drove away from his home, he saw the petitioner pacing back and forth at the corner of Howard Avenue and Lambert Street, just four houses away from where the victim's **110 car was parked. On cross-examination, Console acknowledged that he had multiple felony charges pending against him at the time. In response, the state entered into evidence, as a prior consistent statement, testimony that Console had given at the first criminal trial, before his felony charges, which was materially identical to his testimony at the second criminal trial.
Another state's witness, Angel Delgato, testified that he lived on Howard Avenue at the time of the murder. On the morning of the shooting, he was getting ready for school when he looked out of his window and saw the victim's car parked across the street from his house on Howard Avenue. He saw and heard two people arguing-a person in the driver's seat of the car and a black male standing outside the passenger side door. Delgato recognized the black male, who had distinctive braids and was wearing a camouflage jacket, as someone he had seen in the neighborhood before, though that day he was only able to see the person from the back and side. At trial, Delgato identified the petitioner as the person he saw by the victim's car. After seeing the men arguing, Delgato went back to getting ready for school. A few minutes later, he heard gunshots from outside. When he looked outside, the black male was gone, and he saw the driver in the car with his head resting on his shoulder. He also saw a young girl he recognized from the neighborhood running down the street. Delgato initially told the police he had seen the shooting occur but later stated that he had only heard the gunshots. Delgato had also previously told the police he could not identify the black male, but then admitted that he could, explaining that he had felt intimidated when the police began recording his statement *550 and that he was initially afraid to become involved with the case.
Nilda Mercado, eleven years old at the time of the murder, saw the victim being attacked in the car and **111 heard the shooting as she walked to school that morning. She lived on Howard Avenue at the time and testified that, when walking down Howard Avenue that morning, she saw the victim's car parked on the street and two men fighting inside. She saw a black male on his knees in the passenger seat of the car, and he was choking a white male in the driver's seat. She watched as the black male then held the victim's head down outside of the driver's side door and struck the victim's head repeatedly with the door by opening it and then striking it against the victim's head. Mercado noticed a small object in the black male's hand. She began to walk away from the area, and, then, when she heard two gunshots, she ran to her aunt's house nearby. Mercado could not identify the black male because she did not get a good look at his face, but she testified that he had braids and was wearing a camouflage jacket. She did testify, however, that the petitioner had similar complexion and braids to the black male she saw attacking the victim.[6]
Frankie Harris was a few blocks away from the location of the shooting when she heard gunshots that morning. At the time, Harris was addicted to drugs and living at a nearby YMCA.[7] She was out that morning collecting cans to return for the deposit, which she hoped to use to buy more drugs. When she heard the gunshots, she hid behind a nearby dumpster where she had been searching for cans. A short while later, she saw a black male come running toward the dumpster. She recognized him as the petitioner, who was someone she knew from the neighborhood. When asked if she had any **112 doubt about the identity of the person she saw, she responded, "I'll never forget him." She explained that the petitioner approached the dumpster, took off a camouflage jacket, threw it into the dumpster, and ran away. Harris, believing the shooting might have been drug related, retrieved the jacket hoping that it contained narcotics, but she did not find any, only some papers inside the jacket. She took the jacket back to the YMCA.
Later, Harris was stopped on the street by Gilbert Burton, a New Haven police detective she knew, who asked her if she had any information about the shooting.[8] She retrieved the jacket for the detective. When showed a photographic array of suspects, she initially selected photographs of two persons who possibly had discarded the jacket-the petitioner's photograph and another one. She later told the police that she had been afraid to positively identify the petitioner because her boyfriend had told her not to get involved and that "Melvin was a killer." After she learned that the petitioner had been arrested and was incarcerated, she identified him as the person she had seen with the jacket.
*551 After receiving the jacket from Harris, Burton gave the jacket to the detective working on the case. The jacket size was "large." The detective searched the jacket and found a receipt in one of the pockets. The receipt was for a car repair shop and was for mechanical work done on the victim's car two years before the shooting.
Officer Brenden Canning of the New Haven Police Department testified that he arrested the petitioner on **113 October 19, 1990, two days after the crime, pursuant to an outstanding warrant for breach of the peace. At the time of his arrest, the petitioner was wearing a camouflage jacket, size "regular/extra small," which was seized for evidence. The petitioner was later charged with the murder.
Besides eyewitnesses, the state also presented testimony concerning forensic examinations of the victim's body, the victim's car, and the jacket found by Harris.
Arkady Katsnelson, an associate medical examiner, conducted an autopsy of the victim's body. The victim had a gunshot wound to his abdomen, and the bullet punctured the abdominal aorta, likely causing death within seconds. He testified that the wound would have bled but would not have produced much blood spatter. The victim also had several lacerations on the left side of his head and face, which had bled, indicating the victim received those wounds before being shot. Katsnelson explained that the lacerations were consistent with being hit by the interior side of the passenger door. He further testified that the head wounds may have caused some blood spatter as they began to bleed and the victim continued to be hit, but he did not believe the spatter would be extensive. A separate toxicology test of the victim's blood revealed the presence of cocaine, indicating that the victim was under the influence at the time of his death. Katsnelson determined that the cause of death was homicide from the gunshot wound.
Officer Bennie Smith of the New Haven Police Department examined the inside of the victim's car. He noticed blood on the interior of the driver's side door and blood spatter on the window, driver's seat, and near the dashboard. He also identified nine fingerprints and three palm prints on the interior and exterior of the car, but none of them matched those of the petitioner;
**114 two fingerprints matched those of the victim. Smith also used a vacuum to collect trace evidence from the car, including hairs. While searching the car, Smith found a small vile with white powder residue.
Kiti Settachatgum, a trace evidence analyst for the state forensic science laboratory, examined the hairs taken from the victim's car and compared them to samples taken from the petitioner. Of the hairs found in the car, two of them were identified as "negroid type" hairs. He determined they were not similar to sample hairs from the petitioner but testified that he had received a small number of sample hairs, which may not have provided a representative sample.
Robert O'Brien, a criminalist with the state forensic science laboratory, examined the jacket found by Harris and the jacket the petitioner wore at the time of his arrest. The jacket the petitioner was wearing when arrested was lost before the petitioner's first criminal trial, however, and, thus, was not entered into evidence. He tested stains on both jackets for the presence of blood, but each stain returned negative results. He also tested the cuffs of both jackets for gunshot residue, but the test results on both jackets again were negative. O'Brien clarified, however, that the lack of gunshot residue on either jacket did not establish that a person wearing one of them had not fired a weapon. In fact, *552 O'Brien testified that, more often than not, he would not find residue on the garment sleeve cuffs even in cases in which it was nearly certain that a gun was fired by someone while wearing the garment. On cross-examination, O'Brien testified that he could not give an opinion, based on the evidence, whether the attacker was likely to have blood spatter on his clothing from slamming the victim's head with the car door. He also explained that the "negroid type" hairs found in the victim's car were not tested for DNA because they were not microscopically similar to the petitioner's hairs. **115 In his defense, the petitioner presented testimony from his own eyewitness. Pasquale DeMaio, a house painter, testified that he was on Howard Avenue the morning of the murder painting a front porch. At about 7:15 a.m., he was on the porch when he heard two people arguing in the victim's car, which was parked two houses away. He saw a black male and a white male inside the car, and they began to physically fight. DeMaio testified that he watched them struggle and then heard two gunshots. The black male got out of the vehicle, glanced at DeMaio, and then walked away through an alleyway between houses on Howard Avenue. DeMaio testified that the person he saw had braids and was wearing a camouflage jacket with a large image of the African continent on the back-a feature missing from the jacket found by Harris and the jacket the petitioner was wearing at the time of his arrest. He also testified that he got a good look at the shooter and that the person he saw was not the petitioner. DeMaio did not call the police to report the shooting but was able to see into the car after the shooting before others later appeared on the street and drew his attention to what had happened.
DeMaio acknowledged, however, that he was questioned by police on the day of the murder and that he told them he had not seen anything suspicious that morning. He told the police he had left the area to get coffee shortly after arriving there in the morning and that, shortly after he returned, someone on the street was calling his attention to the shooting. He testified that he was afraid to get involved at the time. DeMaio came forward with his account of what happened after he was contacted several times by phone and in person by two people trying to help the petitioner after he was convicted at his first trial. The two people told DeMaio that the petitioner had been wrongfully convicted, that the state's witnesses had been paid for their testimony, **116 and that there was no evidence to connect the petitioner to the murder. They got DeMaio to sign an affidavit stating that he had, in fact, seen the shooting but that the petitioner was not the shooter. Despite giving this affidavit, DeMaio nevertheless refused to meet with police investigators to look at photographs of possible suspects. The state also presented some evidence indicating that DeMaio would have had trouble seeing inside the victim's car from where he claimed to have been standing and that his view of the car may have been blocked entirely by a soffit on the porch where he was painting.
The petitioner also presented testimony from an expert witness, Louis Roh, a medical examiner from another jurisdiction, who testified concerning the victim's wounds and likely blood spatter. Roh testified that the victim's head injuries were most likely not caused by the car door hitting the victim's head but some other, more pointed object. Roh also testified that blood spatter from the blows to the victim's head would likely have spread in all directions, including onto the attacker.
*553 On cross-examination, however, Roh acknowledged that he did not examine the victim's body or the car door; he instead formed his opinions from reading documentation about the case and after viewing photographs of the victim and the crime scene two days earlier for about one-half hour during a break in the trial. The state also cross-examined Roh about his performance in other cases, in which his conclusions later changed or were discredited by the court, though Roh denied that he had done anything improper in those cases.
During closing arguments, the petitioner's second criminal trial counsel argued that the state had failed to meet its burden of proof because no forensic evidence linked the petitioner to the murder, despite his alleged presence at the crime scene. He reminded the jury that neither the petitioner's fingerprints nor any hairs from **117 the petitioner were found anywhere on or in the victim's car. The petitioner's trial counsel also asserted that the camouflage jacket in evidence had nothing to do with the crime and could not connect the petitioner to the murder, emphasizing that, even though the petitioner supposedly bludgeoned the victim with the car door, no blood was found on either of the jackets allegedly associated with the petitioner, and no gunshot residue was found on the jacket thrown into the dumpster. As for the receipt found in the jacket pocket, the petitioner's counsel accused police investigators of planting it in the jacket to help tie the jacket and the petitioner to the murder. Counsel also questioned whether Harris, a drug addict, had correctly identified the petitioner as the person she saw throw the jacket into the dumpster.
Reviewing the eyewitness testimony, the petitioner's counsel pointed to DeMaio as a more reliable witness, who testified that the petitioner was not the shooter and that the jacket DeMaio saw the shooter wearing did not match the jacket from the dumpster or the one worn by the petitioner when he was arrested. In response to the testimony from the state's eyewitnesses, the petitioner's counsel claimed they identified his client only because the petitioner also had braids and typically wore a camouflage jacket, and he also pointed to factors impacting their credibility.
The state argued that the several eyewitnesses who testified that the petitioner was with the victim at or around the victim's car near the time of the shooting collectively provided strong and consistent evidence of the petitioner's guilt. The state criticized DeMaio's contrary account of what had happened by reminding the jury that DeMaio had initially told police he saw nothing, indicating that he either lied to the police or was lying to the jury. Moreover, the state pointed out, DeMaio came forward only after associates of the petitioner repeatedly contacted him about the case, and **118 the state argued there was some doubt about whether he could have seen what he claimed. Relying on the receipt, the state argued that it provided a compelling connection between the petitioner and the victim. The state acknowledged the lack of physical evidence connecting the petitioner to the crime scene. Regarding the lack of gunshot residue or blood, however, the state pointed to testimony indicating that the absence of either on the jacket found in the dumpster did not establish a lack of the petitioner's involvement. The state also chided the petitioner's counsel for suggesting, without any evidence, that the police had planted the receipt in the jacket.
After deliberating, the jury found the petitioner guilty of murdering the victim, necessarily having rejected the petitioner's evidence.
*554 B
Newly Discovered Evidence
We next review the new evidence presented by the petitioner and accepted by the trial court. At the hearing on the petition for a new trial, the petitioner presented testimony from two witnesses concerning the DNA testing.
Lucinda Lopes-Phelan, a forensic examiner with the state forensic science laboratory, testified that she was tasked in 2010 with examining the camouflage jacket discarded in the dumpster and taking samples from it to test for the presence of DNA. She tested primarily for "touch" DNA, which is usually found in skin cells that can be transferred to an object when a person's skin comes into contact with that object. To test for this, she used moist cotton swabs to swab what she termed as the "wearer" areas of the jacket: the interior of the jacket cuffs and the interior band of the collar where the skin of a person wearing the jacket is most **119 likely to regularly touch the jacket. She swabbed the entire interior of the cuffs and the collar band to collect any biological material from the jacket's surface and then sent the swabs for DNA testing, along with known DNA samples from the victim and the petitioner. Apart from the interior of the cuffs and collar, she did not test anywhere else on the jacket for DNA evidence because the request she received was only for the wearer locations.
Lopes-Phelan testified as to possible concerns and the limitations of the DNA testing on the jacket nearly twenty years after its recovery. First, she was concerned that DNA that might have previously been placed on the jacket could have degraded over time. She observed that the jacket arrived in a sealed plastic bag, which can promote the degradation of any DNA on objects in the bag. She explained that sealing an item locks in moisture, which can lead to the growth of bacteria and mold that can eat away organic material containing DNA, rendering it more difficult to detect during testing. Second, Lopes-Phelan was concerned about contamination-that DNA from others besides the person who discarded the jacket may have been placed on the jacket after it was found. She noted that just a light touch or speaking over the object can result in the transfer of DNA. She pointed out a number of evidence stickers on the bag containing the jacket, indicating it had been presented at a number of court proceedings, and possibly touched by law enforcement officers, attorneys, court personnel, and jurors. She therefore could not be sure how many people might have touched the jacket after it was discarded in the dumpster. Lopes-Phelan testified that other people touching the jacket could have contaminated the results by introducing their DNA in addition to the DNA of the person who had discarded it in the dumpster. She also testified that, in the 1990s, forensic science had not yet developed the ability to **120 test for touch DNA, so law enforcement and lab personnel were not as careful in handling evidence and did not always wear gloves. Third, she was concerned that prior forensic testing might have affected the presence of any DNA on the jacket at the time. She noted that O'Brien, who had tested the jacket for gunshot residue, had wiped the interior portion of the cuffs, and this process can both remove DNA and deposit new DNA on the object being tested. Lastly, Lopes-Phelan testified that some individuals are not "good skin cell shedders," meaning they will leave less DNA on an object they touch, and that wearing clothing under a jacket can inhibit or block the transfer of skin cells.
The petitioner called a second witness, Heather Degnan, a forensic examiner for *555 the state forensic science laboratory, who tested the samples collected from the jacket for the presence of DNA. She began by describing the process used to conduct the testing. DNA material is first extracted from the cotton swabs. Then, any DNA material is "amplified," and the amplified DNA is processed through an instrument that identifies the DNA profile of the sample. In the present case, testing of the sample from the jacket cuffs and collar each identified a mixture of DNA from at least two individuals. Both the victim and the petitioner were excluded as having contributed to either mixture.[9]
Degnan shared Lopes-Phelan's concerns regarding the possibility of degradation of DNA previously transferred to the jacket and the possibility of contamination by DNA from others besides the person who discarded the jacket in the dumpster, which could have occurred well after the jacket was collected. She also reiterated that the DNA testing could not determine when any DNA was placed on the jacket and that the absence of **121 a DNA match does not prove that a person did not have contact with the tested parts of the jacket, only that their DNA was not detected on the jacket during testing.
Lastly, the petitioner entered into evidence a laboratory report explaining that the several hairs recovered from the victim's vehicle were tested for DNA against the petitioner's, and the DNA from the hairs did not match the petitioner's DNA.
C
Analysis
Upon conducting our own, independent review of the new evidence and second criminal trial evidence, we agree with the trial court and are not persuaded that, if the evidence were presented to a new jury, it would lead to a different result.
To help create the probability of a different result in the circumstances of the present case, the new DNA evidence needed to either (1) prove that the petitioner had never touched the jacket, or (2) show, to a meaningful degree, that it was less likely that he had ever touched the jacket. At the second criminal trial, the state relied heavily on eyewitnesses who testified that they saw the petitioner wearing a camouflage jacket while he was with or near the victim. Frankie Harris testified that, shortly after hearing gunshots, she saw the petitioner approach the dumpster, "tak[e] off" a camouflage jacket, and discard it in the dumpster. The jacket recovered from the dumpster contained a receipt linked to work done on the victim's car two years prior. This evidence created a link between the person who discarded the jacket and the victim. Evidence tending to show that the petitioner never wore the jacket would support his argument that he was not the person who Harris saw discarding the jacket and would bolster the petitioner's argument that a lack of any forensic evidence **122 linking him to the crime should create reasonable doubt about his guilt.
Nevertheless, the new evidence falls short. Although the negative DNA result with respect to the petitioner certainly preserves the possibility that he had never touched the jacket, it does not prove that the petitioner never touched the jacket, or even indicate that it is meaningfully less likely that he had ever touched it. In other words, the new evidence does not exclude the possibility, or even probability, that the petitioner had, at some time, touched *556 the jacket. The new DNA testing took place nearly twenty years after the crime, during which time any DNA deposited by the petitioner could have degraded or have been removed. The jacket was brought to the state forensic science laboratory for retesting in a sealed plastic container, which may have promoted degradation. No evidence was presented about how long it had been stored in that manner. Additionally, the jacket cuffs had previously been swabbed in a search for gunshot residue, possibly wiping away any DNA that was there at the time. The test results also do not exclude the possibility that the petitioner touched other parts of the jacket that were not tested. Finally, the forensic examiners testified that the petitioner could have worn the jacket at some point but not transferred any of his DNA because of undergarments or because he might not be a "good shedder" of skin cells. Also, given these uncertainties, neither of the forensic examiners who conducted the retesting testified about whether the negative results indicated any greater likelihood that the petitioner had never touched the jacket. In short, all we know from the negative DNA results is that the petitioner's DNA was not detected on the jacket. In light of the passage of time and other factors, the new evidence does not shed light on the likelihood that the petitioner did or did not touch the jacket. **123 Similarly, the new evidence indicating the presence of DNA on the jacket from at least two other people besides the petitioner and the victim is of uncertain evidentiary value given that this DNA could have been deposited there by someone other than the person who discarded the jacket. The forensic examiners testified that DNA testing does not reveal when that DNA was placed on the jacket. After its recovery from the dumpster and before its testing nearly twenty years later, the jacket had been handled by Harris, who found it, as well as by police officers, forensic technicians, and possibly court personnel, attorneys, witnesses, and jurors. The testimony also established that even a light touch or speaking over an object can result in the transfer of DNA. According to the testimony, the police and forensic technicians might also have been less careful in the 1990s when handling the jacket given that the potential evidentiary value of touch DNA was not known at the time. For these reasons, the experts were unable to exclude the possibility that the DNA profiles detected were placed on the jacket after Harris retrieved it by someone other than the person who had discarded the jacket. This distinguishes the present case from others in which biological material tested for DNA is known to belong to the person who committed a crime, as in the case of blood or semen left at a crime scene by an attacker. In those cases, the evidence typically establishes that the only person who could have contributed to the DNA detected was the person who committed the crime. See, e.g., State v. Hammond , 221 Conn. 264, 280, 286, 288-89, 604 A.2d 793 (1992) (lack of DNA match between defendant and stains on victim's clothing was exculpatory when evidence indicated that stains were left at or near time of murder), overruled in part on other grounds by State v. Ortiz , 280 Conn. 686, 720 and n.19, 911 A.2d 1055 (2006). This is not the case here. **124 Neither is the lack of a DNA match between the petitioner and the hairs found in the victim's car of much consequence in light of the second criminal trial evidence. Witnesses at the second criminal trial testified as to a lack of similarity between the hairs found in the car and the sample hairs from the petitioner, and this lack of similarity was attributed either to the hairs not being from the shooter or to the small *557 number of sample hairs taken from the petitioner. The new DNA testing would conclusively establish that the petitioner was not the source of the hairs, but this would add little value to the petitioner's case. There is no evidence that those hairs came from the shooter, or even when they were deposited in the car. The hairs could have come from anyone who had occupied the car up to the time they were found. There was evidence presented at the second criminal trial that the victim did not keep a clean car and that the car did not appear to have been vacuumed anytime recently.
Because the new evidence is of uncertain import, we are not persuaded that the petitioner carried his burden of showing that it would have changed the result of the second criminal trial. The state's case at trial relied on the cumulative strength of eyewitness testimony, and the state acknowledged the lack of a forensic link between the petitioner and the crime scene. The petitioner attacked the credibility of the state's eyewitnesses on a number of bases, including their past criminal or drug activity and inconsistencies in their testimony. But evidence from at least three witnesses placed the petitioner near or with the victim shortly before the murder. And a fourth witness testified to having seen the petitioner discard the jacket in the dumpster shortly after hearing gunshots. Three of these witnesses had previously seen the petitioner in the neighborhood before the murder and testified that they **125 had recognized him when they saw him near the time of the murder.
At the second criminal trial, the petitioner presented contrary eyewitness testimony from DeMaio that he was not the shooter, although the state elicited testimony from DeMaio calling his testimony into doubt, both because of how his testimony came to light and the possibility that his view of the crime scene might have been obstructed. Additionally, the petitioner's counsel argued that, if the petitioner had been involved, then he would likely have left fingerprints or hair in the car but did not. He also argued that if the jacket had been discarded by the petitioner after having been worn during the murder, there should have been gunshot residue and blood spatter on the jacket, but neither was found. And it is unclear why, if the shooter had been wearing the jacket found in the dumpster, the shooter took a receipt from the victim's car and placed in the jacket pocket before fleeing, only to discard the jacket soon after. The petitioner suggested, without any evidence, that the police planted the receipt.
For its part, however, the state did not rely on a forensic link between the petitioner and the crime scene and did not argue that the petitioner must have been wearing the jacket found in the dumpster at the time of the shooting. As suggested by the state in the present appeal, the jury could have found that the jacket might have come from inside the victim's car, and the shooter (who may already have been wearing a camouflage jacket) took it from the car, wore it briefly, but decided to discard it while fleeing. Indeed, the petitioner was arrested just two days after the murder wearing a different camouflage jacket of a different size.
In any event, despite the petitioner's eyewitness evidence and the lack of a forensic link between him and the crime scene, the jury found the petitioner guilty.
**126 The jury was able to assess the credibility of the eyewitnesses firsthand and necessarily credited the state's evidence while rejecting the petitioner's eyewitness and concerns about a lack of forensic evidence implicating him. At best, the new evidence provides additional support for the petitioner's argument at the second criminal *558 trial that no forensic evidence linked him to the crime. But given that the new evidence cannot establish that the petitioner never touched the jacket or entered the victim's car, or even show that it is meaningfully less likely that he did either, we are not persuaded that additional evidence demonstrating the absence of a forensic link between the petitioner and the crime scene would, more likely than not, have led to a different result.
The judgment of the Appellate Court is affirmed.
In this opinion ROGERS, C.J., and PALMER, EVELEIGH, McDONALD and ROBINSON, Js., concurred.
ESPINOSA, J., concurring in the judgment.
The majority agrees with the claim of the petitioner, Melvin Jones, that, under the circumstances of this case, the trial court's decision denying his petition for a new trial is subject to de novo review. Applying this standard of review, the majority concludes that the trial court properly determined that the petitioner failed to establish that, if the new evidence were presented to a jury, it would probably lead to a finding that the defendant was not guilty. I disagree that the trial court's ruling is subject to de novo review. Instead, I would apply the same standard of review in the present case that this court has applied to rulings on petitions for a new trial for two centuries-whether the trial court abused its discretion. I agree with the majority, however, that, regardless of whether we apply the abuse of discretion **127 standard or de novo review, the petitioner cannot prevail on his claim. Accordingly, I concur in the judgment.
As this court observed in 1903, "[w]hen ... a judgment has been rendered upon the verdict of a jury, and that verdict is based upon evidence sufficient to support it, and no error in law has intervened in the trial and no mistake in pleading has occurred, or other mistake or accident to prevent the party from having a fair trial upon the merits, and the proceedings in the cause have been regular and lawful from its commencement to its close, any legal inference of injustice is excluded. The policy of the law treats it as final for all purposes, and forbids the court which rendered it from entertaining any further proceedings. It is possible that a losing party by some mistake or misfortune, and without fault of his own, may have been unable to produce on the trial evidence now attainable, which, if produced and believed, would demonstrate the injustice of the judgment, and so a new trial may be granted for the discovery of new evidence of this character.
"The application is addressed to the discretion of the court ... and must allege and set forth the evidence produced on the former trial, together with the newly-discovered evidence, in order that the court may see whether injustice has probably been done, and whether the newly-discovered evidence is likely to reverse the result. If the adverse party desires to controvert the accuracy of the statement of the former testimony, or of the new testimony set forth, or to produce other testimony to be considered with that alleged, he may do so, and for this purpose no pleadings are essential.... Or he may admit the accuracy of the statement of the testimony, both old and new, and for this purpose a demurrer is used. In either case, whether upon the testimony old and new-as found by the court after hearing witnesses-or upon such testimony as set forth in the application and admitted, the court decides **128 in the exercise of a sound discretion whether a new trial should be granted or denied .... This discretion is a legal one; it is controlled by the well-established rules defining *559 the requisites essential to granting a new trial. It may be abused by refusing a new trial where all essential requisites exist and the injustice of the judgment is apparent, and error may be affirmed where the trial court has erroneously held it had no power to exercise discretion.... But within these limits the power is discretionary, and its exercise in the denial of a new trial on the ground of newly-discovered evidence cannot be reviewed upon proceedings in error. This principle is firmly settled by many decisions of this court, extending from its organization to the present time." (Citations omitted; emphasis added.) Gannon v. State , 75 Conn. 576, 577-79, 54 A. 199 (1903) ; see also Shabazz v. State , 259 Conn. 811, 821-22, 792 A.2d 797 (2002) ("it is solely within the discretion of the trial court to determine, upon examination of both the newly discovered evidence and that previously produced at trial, whether the petitioner has established substantial grounds for a new trial").
In the present case, the majority does not dispute the general validity of the principle that a trial court's ruling on a petition for a new trial pursuant to General Statutes § 52-270 is subject to review for an abuse of discretion. It concludes, however, that "our deference to the trial court appears to arise historically and primarily from two considerations: (1) the trial judge's superior opportunity to assess the strength of the original trial evidence; and (2) the trial court's role as the arbiter of credibility." Accordingly, the majority concludes that, when, as here, the judge who ruled on the petition for a new trial was not the judge who presided over the criminal trial and neither party contests the credibility of the new evidence, this court is in as good a position as the trial court to determine whether a **129 jury confronted with the new evidence would probably reach a different result, and, therefore, this court's review is de novo. Thus, the majority is persuaded by the petitioner's argument that there is no reason, under these circumstances, to treat petitions for a new trial based on newly discovered evidence differently from petitions for a writ of habeas corpus seeking a new trial on the ground that newly discovered evidence that the state failed to disclose before trial or that the defendant's attorney failed to discover could make a difference in the result. See, e.g., Lapointe v. Commissioner of Correction , 316 Conn. 225, 309 n.63, 112 A.3d 1 (2015) ("Under Brady [v. Maryland , 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] and Strickland [v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ], it must be determined whether the evidence at issue, when considered in the context of the original trial, is of sufficient import relative to that original trial evidence to undermine confidence in the verdict. As in all such cases, our review of that determination is de novo because we are as well situated as the habeas court to make that decision.").
I disagree. It is well settled that the substance, format and timing of a defendant's request for a new trial on the basis of newly discovered evidence can significantly affect the various legal standards that apply to the claim. For example, if a petitioner files a petition for a writ of habeas corpus claiming that he has discovered new evidence that casts doubt on his criminal conviction, but he makes no claim pursuant to Brady or Strickland that he did not receive a fair trial, the petitioner must prove by clear and convincing evidence that he "is actually innocent of the crime of which he stands convicted," and that "after considering all of that evidence and the inferences drawn therefrom ... no reasonable fact finder would find the petitioner guilty."
*560 **130 Miller v. Commissioner of Correction , 242 Conn. 745, 791-92, 700 A.2d 1108 (1997). In contrast, if a habeas petitioner raises a claim under Brady or Strickland , he is required to prove only that that "the withheld evidence is of sufficient import or significance in relation to the original trial evidence that it reasonably might give rise to a reasonable doubt about the petitioner's guilt." Lapointe v. Commissioner of Correction , supra, 316 Conn. at 263, 112 A.3d 1. The reason for this much lower standard in cases involving Brady and Strickland claims is that the petitioner's right to a fair trial may have been violated. See Summerville v. Warden , 229 Conn. 397, 430-31, 641 A.2d 1356 (1994) (explaining why habeas petitioner who has not raised claim that his right to fair trial was violated has higher burden of proof).
The timing of the postconviction relief sought by a convicted defendant also matters. If a convicted defendant files a petition for a new trial on the basis of newly discovered evidence, he need not meet the extremely high level of proof required of a habeas petitioner raising a similar claim, but must prove only that the evidence would probably cause the jury to find him not guilty. See Asherman v. State , 202 Conn. 429, 434, 521 A.2d 578 (1987) (petitioner must demonstrate that newly discovered evidence "is likely to produce a different result in a new trial"). This lower standard applies to petitions for a new trial because the state's interest in finality increases as time passes. See Summerville v. Warden , supra, 229 Conn. at 427, 641 A.2d 1356 ("[F]or a petition for a new trial, within the three year limitations period, the petitioner's interests trump those of the public and the state. Beyond that period, however, the interests of the public and the state [in preserving the finality of judgments, in not degrading the properly prominent place given to the original trial as the forum for deciding the question of guilt or innocence within the limits of human fallibility, and in the fact that in many cases an order for a new trial may in reality reward the accused **131 with complete freedom from prosecution because of the debilitating effect of the passage of time on the state's evidence] trump those of the petitioner.").
It is clear to me, therefore, that, when considering what standard of review should apply to a petition for a new trial on the basis of newly discovered evidence, the primary factors that this court should consider are whether the defendant received a fair trial and the concomitant presumption of finality, not whether the trial court was in a better position to weigh the new evidence against the evidence that was presented at trial or to judge the credibility of the new evidence. This court has recognized for two centuries that, in light of these factors, the trial court has broader discretion to deny relief when a petitioner has filed a petition for a new trial on the basis of newly discovered evidence than it does when a petitioner has claimed that his constitutional right to a fair trial was violated. See Gannon v. State , supra, 75 Conn. at 578, 54 A. 199 (since this court was created, trial court's ruling on petition for new trial has been subject to review for abuse of discretion because "[t]he policy of law treats ... as final for all purposes" any conviction that has been obtained in proceedings that "have been regular and lawful from ... commencement to ... close," unless "the injustice of the judgment is apparent " [emphasis added] ); see also Lapointe v. Commissioner of Correction , supra, 316 Conn. at 308 n.62, 112 A.3d 1 ("Of course, a defendant seeking a new trial on the basis of newly discovered evidence bears a significantly higher burden of establishing the materiality of the evidence at issue than a defendant raising a claim under *561 Brady or Strickland . This is ... because Brady and Strickland seek to vindicate the defendant's fair trial rights, whereas a new trial petition based on newly discovered evidence does not."); Skakel v. State , 295 Conn. 447, 522, 991 A.2d 414 (2010) ("[t]his strict standard [applicable to petitions for a new trial brought **132 pursuant to § 52-270 ] is meant to effectuate the underlying equitable principle that once a judgment is rendered it is to be considered final, and should not be disturbed by posttrial motions except for a compelling reason" [internal quotation marks omitted] ), quoting Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578.
In my view, the statement in Gannon that finality is presumed when a petitioner has received a fair trial is not inconsistent with the court's statement in Summerville that "the petitioner's interests trump those of the public and the state [in the finality of the conviction]." Summerville v. Warden , supra, 229 Conn. at 427, 641 A.2d 1356. As I have indicated, in Summerville , this court focused on the timing of petitions for a new trial on the ground of newly discovered evidence and petitions for a writ of habeas corpus raising the same claim to explain why a lower standard of proof applies to a petition for a new trial. It does not follow from the fact that a lower burden of proof applies to petitions for a new trial that the trial court has no more discretion to rule on a petition for a new trial that follows a fair trial than it does to rule on a habeas petition raising a claim that the petitioner's right to a fair trial was violated. I also recognize, of course, that a higher burden of proof is not the same thing as a more deferential standard of review. What Lapointe, Skakel and Asherman make clear, however, is that the fact that the defendant has received a fair trial is a critical factor in determining what legal standards apply to the defendant's postconviction claims. Accordingly, I would conclude that, as long as the trial court's ruling on a petition for a new trial on the basis of newly discovered evidence was reasonable, it should stand, even if the reviewing court might disagree with it. See State v. Annulli , 309 Conn. 482, 491, 71 A.3d 530 (2013) ("[u]nder the abuse of discretion standard, [an appellate court] makes every reasonable presumption in favor of upholding the trial **133 court's rulings, considering only whether the court reasonably could have concluded as it did"); State v. Deleon , 230 Conn. 351, 363, 645 A.2d 518 (1994) ("[t]he issue ... is not whether we would reach the same conclusion in the exercise of our own judgment, but only whether the trial court acted reasonably").
The majority points out that the fact that "judges often disagree on the correct outcome under the governing legal standard ... does not, itself, convert a question of law into an exercise of discretion." Conversely, however, this court's adoption of guidelines, like those set forth in the four part test in Asherman v. State , supra, 202 Conn. at 434, 521 A.2d 578, for determining whether a petition for a new trial should be granted, does not convert a discretionary judgment into a question of law. There clearly are circumstances under which reasonable people might disagree as to whether certain undisputed evidence would be likely to produce a different result in a new trial under the fourth prong of that test. In my view, when that is the case, the trial court's judgment should prevail.
Under the majority's decision, however, a petitioner may prevail on appeal from the denial of a petition for a new trial on the basis of newly discovered evidence even though the petitioner received a fair trial and even though the trial court's decision was reasonable . Of course, it is only when reasonable minds might disagree as *562 to the proper result that application of the de novo standard of review could make a difference in the outcome on appeal. If no reasonable person could disagree with the trial court's ruling on a petition for a new trial, it would survive under both the abuse of discretion and de novo standards of review, while, if no reasonable person could agree with the ruling, the ruling would be reversed under both standards. The majority's decision clearly undermines the state's strong interest in finality in cases in which the defendant received a fair trial **134 by encouraging the filing of appeals in cases where reasonable minds could disagree regarding the proper result. For these reasons, I disagree with the majority's determination that rulings on petitions for a new trial based on newly discovered evidence are subject to de novo review under the specific circumstances of the present case. Instead, I would conclude that such petitions are subject to review for an abuse of discretion.
I therefore respectfully concur in the judgment.

While his appeal from the first criminal trial was pending, the petitioner also filed an earlier petition for new trial, which the trial court granted. See State v. Jones , 50 Conn. App. 338, 340, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999).

After the jury found the petitioner guilty of the victim's murder, the state introduced evidence that he had been previously convicted of murder in 1976. As a result, the defendant was convicted of capital felony. See General Statutes (Rev. to 1989) § 53a-54b (3).

The certified question originally referenced the decision of the "habeas court ...." (Emphasis added.) Jones v. State , supra, 322 Conn. at 906, 140 A.3d 977. This was an error, as this case arises from a petition for a new trial and not a petition for a writ of habeas corpus. We have therefore corrected our formulation of the certified question. See, e.g., Taylor v. Commissioner of Correction , 324 Conn. 631, 637 n.2, 153 A.3d 1264 (2017).

Because this case turns on only the fourth element of Asherman , we do not consider whether under any other particular circumstance a de novo standard of review should apply to a decision under the first three Asherman elements.

At trial, Hodge claimed that the detective he spoke to, who he had previously worked for as an informant, had shown him the suspect's photograph before showing him the photographic array. Hodge acknowledged, however, that he had not told anyone that version of events before the second criminal trial, that the detective had told him that being a witness was different than informing, and that he was told that he would not be compensated for his cooperation.

In a meeting with police, Mercado reviewed a photographic array and was unable to identify the petitioner as the attacker. Instead, she pointed to a photograph of another person who had a similar complexion to the person she saw, but with different hair. She did not claim the person in the photograph that she had pointed to was the attacker.

By the time of her trial testimony, Harris had stopped using drugs and was working as an HIV/AIDS and substance abuse referral counselor.

There was some confusion about when Harris told Burton that she found the jacket. At some point, she told police that she had found the jacket three days before she gave it to Burton, which would have been before the murder. But Harris testified that, at the time, her drug use led her to lose track of days and time.

Because of some concerns regarding the reagents used to test the DNA samples, the samples were later retested and produced the same results.